## WELLS, TRUSTEE, v. STOUT et al.

An agreement for separation between husband and wife, entered into through the intervention of a trustee, is not invalid as against public policy, and will be upheld and enforced, if followed by immediate separation, or if separation has previously taken place.

A conveyance of land on the part of the husband to a trustee, securing the payment of an annuity to the wife, in consideration of an indemnity by the trustee against all debts of the wife, for maintenance or other account, is valid and supported by a sufficient consideration.

A provision made by the husband for the wife is not void as against *subsequent* creditors, provided the husband is solvent at the time.

Subsequent reconciliation and cohabitation will avoid a deed of separation; the maintenance of the wife becoming thereupon obligatory upon the husband, the consideration of the deed fails.

Mere hearsay evidence of the wife having given birth to a child more than a year after the separation, and connecting therewith the name of a third party as its reputed father, raises no presumption of access by the husband.

Mere access is not sufficient, if proved, to establish such a reconciliation and cohabitation as will avoid a deed of separation.   To effect that end, the reconciliation must be permanent, and followed by cohabitation, and restore the former relation of the parties.

The rule as to the presumption of access applies only to cases affecting children, and has no application to the parties.

The Court is bound to take judicial notice of the general laws in force in this State at the cession of California, which remained unrepealed until the act of April 22, 1850. Those laws are not regarded as foreign so as to require proof of their existence.

An execution issued upon a judgment of the District Court rendered in 1850, before the judgment was signed by the District Judge, is void, and a sale under such execution passes no title to the purchaser.

Where parties claim under a deed executed by the sheriff upon a sale on execution, they are chargeable with notice of the defects in the judgment upon which the execution issued.

APPEAL from the Superior Court of the City of San Francisco.

This is a suit in equity, to enforce the covenants of a deed of separation, entered into between William Stout and his wife, Mary Stout, through the intervention of a trustee.   The deed was executed by the husband and wife at San José, on the 16th

of February, 1850, in the presence of several witnesses, of whom the defendant, Jacob W. Stout, was one. The parties had previously agreed upon Talbot H. Green as trustee, and he had consented to accept the trust. On the day following the execution of the instrument by William and Mary Stout, it was taken by William Stout to San Francisco, and there delivered to the trustee, who read it over and signed it. The day afterwards, whilst on his way to the office of the alcalde, for the purpose of placing the deed on record, he was served with notice from the sheriff's office, that unless he made a certain payment, the lot described in the deed would be sold; and thereupon he proceeded to consult his counsel, who advised him not to act without a bond of indemnity against suits. He then wrote to Mrs. Stout, requesting her to send him a bond. Whether his letter was ever received does not appear; but no bond was sent to him, and he left the deed with his counsel, without any instructions as to its disposition. There is some conflict in the testimony, whether any further action was taken by the trustee. One of the witnesses testifies that he applied in December, 1850, or in January, 1851, for a lease of the premises described in the deed, and to an inquiry as to the title, was informed by the trustee that the property was held by him in trust for Mrs. Stout. The deed was recorded in the office of the alcalde, in a book designated as "Miscellaneous Records," on the eighteenth day of April, 1850.

The deed recites that William Stout and Mary his wife, "in consequence of various unhappy differences, have agreed to live separately and apart from each other during the remainder of their lives;" and contains the covenants usual in instruments of this kind, on the part of the husband, with the trustee, that the wife may live separately, at such places and with such families, relatives or friends, as she may think proper, without molestation or hindrance by him; and a covenant for the payment to the wife, or to the trustee for her, during her life, of an annuity of $3,000, in equal monthly instalments. To secure the payment of this annuity, William Stout, by the deed, conveyed to the trustee certain premises situated in the city of San Francisco, upon the trust that the trustee should permit William Stout to receive the rents and profits until default be made by him in the payment of the annuity, or some part thereof; but in case of default in such payment for the space of fifteen days, then, upon the trust, to raise out of the rents and profits the annuity, or so much thereof as might be in arrear, in addition to the expenses, and to apply the same as Mary Stout might in writing direct, or for want of such direction, to Mary herself, for her sole and separate use and maintenance, with a proviso, that for any sum which the husband or his representatives might be compelled to pay for her, a deduction should be made from the first instalments of the annuity. In consideration of the premises, the

trustee on his part covenants with William Stout to indemnify him against all debts of his wife, for maintenance or other account, whilst she lives separate and apart from him, and enjoys the annuity. Upon the execution of this deed, William and Mary Stout separated, and have ever since lived separately, and he has never been required to pay any debts contracted by her, or any expenses incurred on her account.

In April, 1851, Green, the trustee, left California, and his residence was unknown for several years. In October, 1851, Mrs. Stout, not having received any payments on account of her annuity, commenced the present suit. Objection being made to the suit, in the name of Green, on petition to the Court, the present plaintiff was appointed trustee in his place.

On the nineteenth of April, 1850, judgment by confession was rendered in the District Court of San Francisco county, in favor of the defendant, Jacob M. Stout, against his brother, William Stout, for a sum exceeding nineteen thousand dollars, but was not signed by the District Judge until June 8, 1850.

The record in the District Court alleges that the debt for which the judgment was confessed existed April 1, 1850. It does not show that it was contracted previous to that date. Upon this judgment, execution was issued April 26, 1850, and the premises included in the deed of separation were sold under it on the twenty-seventh day of May, 1850, and bid in by the defendant Jacob M. Stout, to whom a conveyance was made by the sheriff.

The defendants, who answered in the suit, and resist the relief sought by the plaintiff, derive their title to the premises in question under this sale and conveyance by the sheriff. Judgment by default passed against several of the defendants, and among the number, against the defendant William Stout.

There is some hearsay testimony in the record that Mrs. Stout had a child in the summer of 1852, and it does not appear that her husband was absent from the State after the execution of the deed, but the same testimony which states the birth of the child gives the name of its reputed father.

A notice of lis pendens was filed in the recorder's office of San Francisco in May, 1854, and the present holders of the premises described in the deed of separation purchased with notice of this suit.

After a protracted litigation, the plaintiff obtained a judgment against William Stout for the arrears of the annuity, and for the possession of the premises, with authority to collect the rents until they amount to a sum sufficient to pay the judgment, with accruing monthly payments of $250 during the joint lives of William and Mary Stout, besides the taxes and necessary expenses.

From the judgment the defendants appealed.

*H. P. Hepburn* for Appellants.

I. It is admitted that deeds of separation have been tolerated in England, where ante-nuptial settlements are so common that contracts like the present have been unwittingly sustained by the Courts, to the regret of later and wiser Judges, as will be seen in the opinion of Lord Eldon, in the great case of St. John v. St. John, 11 Vesey, 526; reiterated in Westmeath v. Westmeath, 5 Bligh R., N. S., 356; S. C., 1 Dow & Clarke, R., 519. In this case Lord Eldon not only expressed his regrets at the past decisions on the subject, but entertained doubts whether they should be concurred in. We beg to call especial attention to Atherly on Marriage Settlements, 385, Law Library, vol. 27, p. 200, note 1. The opinion of Lord Eldon is there criticised with great acumen and force, and the conclusion is irresistibly drawn that Eldon condemned such contracts, even when made through the intervention of a trustee covenanting with the husband, as void, notwithstanding the previous decisions. Out of respect, however, to them, he sent the case to the House of Lords, in order to have the question settled by that high tribunal. Speaking of his dissent from the very doctrine contended for by the plaintiff in this case, he says:

" This doubt has long had place in my mind. If this were res integra, untouched by doctrine or decision, I would not permit such a covenant to be the foundation of an action or suit in this Court, but if dicta have followed dicta, or decision has followed decision, to the extent of settling the law, I can not, upon any doubt of mine as to what ought to have been originally the decision, shake what is the settled law upon the subject. It is better that the case should go the House of Lords than that the law should remain in this state, upon a point connected with the well-being of society."

The American cases upon this subject are very few, being but seven in number, as quoted by plaintiff's counsel, and referred to in the text-books, from which the doctrine of the plaintiff is drawn, and we have been able to find none others.

We unhesitatingly say, after a very careful examination of all the American cases, that there is but one in which a deed of separation has been enforced directly. That is the case of Read v. Beazley, 1 Blackford, 97, and in that case the Court relies solely on the course of the English decisions, and says that in England it has been thought better to let parties separate if they can not live together; hence the policy of the law in England on this subject. It will be shown hereafter that the policy of the law here is different, on account of a difference in the state of society, and the law of divorce.

We will now analyze the other American cases. The case in 3 Paige, 500, is a case where the wife releases her dower by the articles of separation. The husband, by his will, bequeathed her a certain sum for the release of her dower. The Court con-

strued the provisions made in his will to be a bounty on his part, and a sum in addition to that allowed by the articles of separation, and allowed her to take both in lieu of dower.

The case in 4 Paige, 516, is this : The wife asks the Court for an allowance pending her suit for a divorce; the husband replies that he had made her a separate allowance. But the Court says that the separate allowance and agreement to separate are void, being made without the intervention of a trustee, and grants her the allowance asked for, saying, incidentally, that the articles of separation might have been good if made through the interposition of a trustee. The articles in the case of 4 Dana, 141, were made without trustees. The Court declares them void, but held that if trustees had intervened they would have been valid.

In the case in 14 Smedes & Marshall, 59, the agreement of separation was verbal. The Court says that, without deciding the question whether a verbal agreement of the sort is valid, this agreement, being made without trustees, is void.

In the case in 3 Barr, Hutton v. Duiz, the wife seeks to repudiate the articles after the death of her husband, and acquiescence on her part in them, and the receipt of the sum secured by them. Her claim to her share of the husband's estate was relinquished by her in the articles. The Court considered them consummated by the death of the husband, and held her bound by them.

The articles were made without the interposition of trustees, and were conceded to have been void during the life of the parties; so that the validity of the articles was not in question.

In Battle v. Wilson, 14 Ohio, 257, the suit was upon a bond of the husband to third parties for the use of the wife. The bond is set forth in the case, and did not contain one word about separation.

Thus it will be seen that in all the American cases but one, these settlements have been introduced collaterally, or have been approved of in *dicta*, not being the subjects of the controversy at all, or they have been treated as consummated contracts after the death of one of the parties.

The smallness of the number of American cases on this subject is, no doubt, owing to the difference between the condition of society here and in England.

In this country, we are not habituated to marriage settlements of any kind, ante-nuptial or post-nuptial; but in England, among the wealthy classes, marriages have been greatly influenced by pecuniary considerations, or, at least, have been attended with settlements so much as a matter of course, that at last it has been looked upon as a tie, which, as it has been commenced by settlement, may be suspended by the same means. At the same time, the law of divorce in England encourages such contracts as this. There, a divorce *a vinculo* can not be obtained except for

such a cause existing before marriage, as, according to the ecclesiastical law, would make the marriage a nullity.

For causes arising subsequently to marriage, a divorce *a mensa et thoro* alone was granted. See Bl. Comm., 1, 440.

The consequence is, as the parties could not procure any greater relief in such cases, by an application to the Court than by their private agreement, they resorted to these settlements, and the Courts, considering that they avoided the scandal of an application to the Courts, and produced the same practical results as a divorce *a mensa et thoro*, have on this account, and this alone, felt inclined to sustain these arrangements. But in the United States generally, and especially in this State, divorce *a vinculo* is granted for causes arising after marriage; and in the most of the cases in which articles of separation would be resorted to in England, a divorce *a vinculo* can be obtained here through the Courts. Hence the rareness of cases based on articles of separation arising in the Courts in this country.

The policy of the American Legislature on divorce is adverse to articles of separation, and the converse of the reasoning which may induce the Courts in England to favor them, should cause the American Courts to look upon them with disfavor.

The Supreme Court of this State has laid down the doctrine, in Abel *v.* Caldewood, 4 Cal. R., 90, that in cases where the law has been departed from in decisions in other States and in England, that in this new State, when uncontrolled by decisions here, we should hold to the law, notwithstanding the precedents elsewhere to the contrary.

It would be difficult to conceive a case in which this doctrine could be applied so properly as to the present one.

II. The contract is not to be adjudged by the rules of the common law, but by those of the civil law.

It was entered into on the sixteenth day of February, 1850, a time when all contracts in this State were regulated and governed by the civil law. See Smith *v.* Fowler, 2 Cal. R., 569.

Such a person as a trustee is unknown to the civil law, as was admitted in the argument by the counsel of the plaintiff.

The consequence is, that all the decisions which have unguardedly allowed such transactions to be sustained, through the technical interposition of a trustee, lose all force as precedents, and the case is, therefore, such a case as one at common law would be where a trustee had not been interposed, and the Court is left untrammelled by the authorities which have, on purely technical grounds, sustained a contract which, without such technicality, would be at once condemned as immoral and destructive of the very foundation of society.

That such a contract at common law would not be sustained, even in England, without the intervention of a trustee, is a proposition that cannot be disputed.

This contract cannot be sustained at the civil law, and, as we have been informed by gentlemen who have practiced extensively under that law, no lawyer would pretend to assert a claim under such a contract in a civil law Court.

The dominion of the husband over the person of the wife at the civil law, is absolute, and she is obliged to follow him wherever he may go, and they cannot by their agreements derogate from the power of the husband over the person of the wife. Code of Louisiana, Art. 2307 ; Code Napoleon, Art. 1388.

In 14 Merlin, title 5, § 25, " of the contract of marriage," the doctrine of the civil law is laid down, as follows :

" There can be no derogation from the power of the husband over the person of his wife ; so that the agreement by which the wife would be authorized, in case of incompatibility of temper, to live separate from her husband, or the husband to live separate from his wife, would be null, and of no effect."

In Escriche, title " Donation among the Spouses," the law is laid down thus :

" That which one of the spouses makes to the other during the marriage is prohibited.   This kind of donation is null :

" 1. It is not decorous that the affection which ought to unite mutually the hearts of the husband and wife should be venal, and could be gained or preserved by presents.

" 2. Because otherwise it would happen many times that the excessive love of one of the spouses might cause him to despoil himself of his property in favor of the other.

" 3. Because by importunities and differences which might be excited continually, the one could oblige the other to buy peace and domestic repose at the cost of his property.

" 4. Because the resistance which one might make to the donation that the other might seek, would give rise to frequent divorces and separations."

In Merlin, vol. 19, p. 337, Art. Mari., the following case is given :

" Mr. Danbrenez, domiciled at Brussels, agreed to pay his wife yearly, during all the time his absence would last, the sum of 2,000 florins for her maintenance, that of her daughter, and the expenses of the establishment.   In default of payment Madame D. sues her husband.   The Court of Appeals at Brussels, considering that the agreement has all the appearance of an act of voluntary separation, declares that she has no right of action."

III. The articles have not been executed on the part of the trustee, and therefore cannot be enforced.   The trust was not accepted.

The mere signing of the trustee did not bind him, for it was evident that he conceived something further was to be done by him in order to consummate the obligation on his part; before that has been accomplished his mind receives a new impression,

by which the intention which he had of binding himself is completely altered, and he never does the act which he conceives is necessary to bind him. 10 Mass. R., 458; 20 Pick. R., 28; 4 Cushing, 285; 30 Me., 110; 1 Halsted Ch. R., 430, 452; 2 Stoddart's Eq. R., 370; 3 Met., 275.

The mere signing is an act which he may revoke, as no one is prejudiced by it, being done whilst the party signing was alone, and he under no obligations whatever to sign.

There must be shown on the part of Green an intention to be bound, consummated by some final act.

In this case there is no pretence that the signing of Green caused the husband and wife to act on the articles. There must be, therefore, shown a voluntary and completed assumption of the obligation of the covenant on his part.

It is to be observed that our title is under a judgment and execution-sale against the husband. Our position is, therefore, such, that unless the husband has been indemnified against his wife's debts, by the executed covenant of the trustee in the article, they can have no validity whatsoever against us. The law upon this point is laid down in Atherly on Marriage Settlements, 379, (Law Library 27, p. 197,) in these words:

"But it may be asked, will such a settlement be good where the husband is not indemnified? The decision in the case of Fitzer v. Fitzer, is a complete answer in the negative. And the decision in this case may be considered as the stronger, from the circumstance of the debt, which was owing to the creditor who impeached the settlement, having arisen subsequent to the settlement. Lord Hardwicke, in fact, seemed to consider every settlement, by way of separate maintenance, as void against creditors in case the husband had no indemnity against his wife's debts, on the ground, that a man is bound by law to provide for his wife. His Lordship looked upon such settlement as a settlement for the husband's own benefit, and, consequently, as falling within the act of the 13 Eliz."

In Atherly on Marriage Settlements, it is laid down as law, that settlements, upon separation, are viewed with great suspicion as against creditors, where they are disproportioned to the husband's means, or are soon followed by his bankruptcy, and often, under such circumstances, declared fraudulent against creditors.

IV. The judgment of April 19, 1850, was regularly entered. The issuance of the execution before the judgment was signed by the District Judge, was a mere irregularity, for which the validity of the sale made and deed given by the sheriff can not be attacked collaterally.

V. The deed of separation was not duly registered. The record in the alcalde's office did not impart notice to the purchasers at the sheriff's sale.

VI. If it should be held that the deed of separation was valid, and that the trust had been accepted, still the wife has no claim to the annuity, because the parties afterwards came together and were reconciled.

In 2 Story's Equity, § 1428, the learned Commentator says : " In the next place, even in case of a deed for an immediate separation, if the parties come together again, there is an end to it with respect to any future as well as to the past separation." And cites numerous authorities in support of this doctrine.

It is in evidence, that Mrs. Stout, in the summer of 1852, had a child while living with her sister at San Luis Obispo, in this State. There is no proof that her husband was out of the State. On the contrary, the witnesses all speak of him as living in this State, and he is believed to have lived here continuously until the present moment.

We contend that the parties must be presumed to have come together. The law presumes access of the husband in case of the birth of a child, unless it be shown that access is impossible, or the presumption of access, (which has been laid down in all the law books as a very strong presumption,) is rebutted by evidence which outweighs. 1 Black. Com., 457.

*Fletcher M. Haight and Joseph G. Baldwin* for Respondent.

1. A deed of separation acted upon will be upheld without any trustee. See Hill on Trustees, 426, and authorities cited ; 2 Roper's Husband and Wife, 292.

No covenant is necessary to support the deed against the husband himself. A deed of separation usually contains a covenant by trustees to indemnify the husband against support of wife, but the absence of such a covenant on the part of the trustees will not invalidate the deed, but it is binding on the husband himself, although for the want of a proper consideration it would not hold good against existing creditors. Hill on Trustees, 426, authorities cited ; 2 Atkyns, 511 ; Frampton *v.* Frampton, 4 Beven, 287 ; Read *v.* Beagley, 1 Blackford, 98 ; Ross *v.* Willoughly, 10 Price, 2 ; Clough *v.* Lambert, 10 S. 174, E. C. R., vol. 16. Claims of creditors do not intervene ; appellants are neither creditors nor representatives of creditors. If they were, it would not aid, as the deed of separation was made before any debt to Jacob W. Stout. The debt is stated in the declaration, and we have no evidence of its originating earlier than April 1, 1850. Deed, February preceding. Jacob W. Stout was a brother of William Stout, and a subscribing witness to the deed of separation. Green did assent and exercise the trust, and executed the covenant on his part.

" A trustee can not defeat a trust-deed by refusing to accept the trust, and, if necessary, the Court will appoint a trustee in his place." Dawson *v.* Dawson, Rice Ch. Reports, 152.

"The absence of a trustee in a deed of trust, is not necessary to sustain the trust, and if he refuse to accept the trust, chancery will execute it." Field v. Arrowsmith, 3 Hump., 442.

No formal acceptance on the part of the trustee named in the trust-deed is necessary to pass the title. Bixler v. Taylor, 3 B. Monroe, 362; Picket v. Johns., 1 Dev. Ch., 123.

2. A deed signed, sealed, delivered, and acknowledged, which is committed to a third person as the deed of the grantor, to be delivered over to the grantee on a future event, is the deed of the grantor, presently. Wheelright v. Wheelright, 2 Miss., 447; Hatch v. Hatch, 9 Miss., 309; 3 Met., 412.

A deed may be delivered as such without any act of delivery. Mills v. Gore, 20 Pick., 28, 36.

It is not necessary to the validity of a deed conveying land in trust, that the *cestui que trust* should execute it, or express an assent to it. His assent will be presumed until the contrary is shown. Wiscrall v. Ross, 4 Porter, 321, and cases. Nor is it necessary that the trustee should sign it. De Woods v. Holland, 1 St. & Porter, 9; Belden v. Carter, 4 Day, 66; Ruggles v. Lawson, 13 Johns., 285.

3. A deed of separation, through the intervention of a trustee, is valid and binding, and may be enforced in chancery, in respect to all collateral covenants. Carson v. Murray, 3 Paige, 500; opinion of Walworth, Chancellor.

This matter is fully discussed in Bright's Husband and Wife, vol. 2, p. 305, book 4, chap. 1. An agreement between husband and wife, without the intervention of a trustee, can not be enforced; though where the agreement has been acted upon it has been upheld. 4 Paige, Rogers v. Rogers, 516; Hutton v. Day, 2 Barr, 100, for a case where an agreement for an immediate separation, acted upon, was supported. Hill on Trustees, 425; ed. by Wharton, and note of the American editor.

The American authorities seem also to maintain the principle that a deed providing for a future separation is not valid, though cases are to be found in which this exception was disregarded. The principle is undeniable, that in a deed of separation by a trustee on the part of the wife, an immediate separation is contemplated, and if it actually takes place, all the covenants in the deed providing for the support and alimony of the wife will be maintained. They are good at law; much more are they available upon the doctrines of equitable jurisprudence. 2 Story's Equity, §§ 1427–8; Simson v. Simson, 4 Dana, 141. Since writing the above, the case of Wilson v. Wilson, 14 Simon's Rep., in 37th vol. of English Chan. Rep., 405, contains the whole of the law, and review of all the cases. See 14 Ohio Rep., 257; 3 Barr, 100; 8 Georgia, 341.

In Hill on Trustees, marginal page 428, the author says:

" And where the wife is entitled to a provision by virtue of a contract, whether contained in marriage articles, or in a covenant, or deed of settlement, it is clearly settled that the trust may be enforced in her favor, notwithstanding her adultery, although she may be living apart from her husband; and a suit by the trustees against the husband, for that purpose, may be sustained."

To these propositions the author cites Sidney v. Sidney, 3 Peere Wm., 270; Blout v. Winter, ibid., 270; Moore v. Moore, 1 Ark., 286; Seagrave v. Seagrave, 13 Vesey, 439. Bright's Husband and Wife, vol. 2, p. 87, and following § 10, sums up the principle as laid down by Roper in his treatise : " That the wife's elopement only, or her elopement and adultery, do not deprive her of the power of enforcing any of her legal or equitable rights, with the exception of her 'right to dower.' The right to dower is forfeited by statute." On this see same author, on page 350, § 10. At common law, adultery did not prevent the wife from enforcing her civil claims; and before the statute of Westminster 2d, she was entitled to dower, and the exception of it, by a particular provision, proves that in other cases adultery was no bar to the wife enforcing any of her rights in Courts of Justice.

4. The next point of objection is, that, by the Mexican law in force at the date of this contract, it was a nullity; and it is assumed that upon this subject the Mexican law is the same as the civil law of Spain and France. What the Mexican law, as applied to California was, at the time of the execution of this contract, there is no evidence in the case, or in the brief of our opponents. On this point we answer :

Admitting the law of Spain governs, it is in substance the common law, and to be administered by Ecclesiastical Courts. Civil Laws of Spain and Mexico, by Schmidt, p. 10; 1 White, 44. Separation from bed and board might be in an ecclesiastical forum, but not by consent of parties. Such is the English law, or at least the doubt has been whether articles of separation will be enforced to compel a separation in fact, though all collateral engagements might. A separation is not lawful, in the strict sense of the term, now in England, unless by a decree of Consistorial Court. Separation from bed and board, to have all its legal attributes, must be by the consistorial, which answers to the Spanish Ecclesiastical Court.

All this does not begin to prove that even under the civil law the husband might not be bound to pay an annuity, in consideration of being indemnified against the support and debts of the wife. In the case cited from Merlin there was no consideration. It was a mere engagement between husband and wife, without consideration, and void under any system of law, as an executory agreement. To make a valid agreement, consideration is as necessary under the civil as the common law.

The subject of donations inter vivos has no application to this

matter. We do not claim under a donation, but a contract. For this matter, see same author as above cited, p. 255, Schmidt Civil Laws of Spain; White, vol. 1, p. 56, and following.

5. We come now to the defendants' case. They claim under a judgment and execution against William Stout, rendered nineteenth April, 1850. The origin of the debt, as appears on the record, is subsequent to the deed of separation. The debt did not exist at date of deed. As against this judgment being for a debt subsequent to the deed, the provision for the wife was not fraudulent. Whatever may be the English decisions in former times, under our statute, as now expounded, a provision for wife or family is valid against subsequent creditors. The only test is, was the husband solvent when he made the deed.

But as defendants claim under judgment, execution, sheriff's sale, and deeds duly registered, it becomes necessary to see whether these proceedings were effectual to pass any title in William Stout. To these proceedings there are several objections. Laws of 1850, p. 443.

*First*—There was no judgment until the record was signed by the Judge, which might be done after four days. No execution could issue until after judgment signed; judgment seems to be entered nineteenth of April, but not signed until eighth of June, 1850. Execution issued twenty-sixth of April, 1850—of course, before it could issue—it was, therefore, a nullity.

*Second*—The sale took place twenty-seventh of May, before any judgment was signed, and before any execution could issue. The whole proceeding is a nullity. It is not a case of mere irregularity; the proceeding was null and void. Common law was introduced nineteenth of April, 1850. By the common law no execution could issue until judgment signed. Barrie *v.* Dana, 20 John., 307. See authorities as to common law of England, by Kirkland, *arguendo.* If issued before judgment signed, execution is a nullity. Practice Act was passed April 22d, 1850. The enactment requiring a record to be signed before execution, was according to the practice at common law; but we are not left here. The act entitled "An Act to organize the District Courts of the State of California," was passed March 16th, 1850; and by the thirty-first section of that act (page 96 of Laws of 1850,) no process could issue on judgment until the record was signed. Until signed it was of no validity, and the omission to sign was not amendable. See Butler *v.* Lewis, 10 Wendell's Rep., 542. The Court say, as to a judgment not signed, it was mere blank paper, so far as the judgment was concerned.

The execution was issued after the passage of the Practice Act. The judgment and execution were after the act of sixteenth of March, 1850. The sale was the twenty-seventh of May, before any judgment, it not being signed until eighth of June. The execution was void.

6. The point is made that Mrs. Stout, having had a child after the separation, and while living apart from her husband, is evidence of a reconciliation, which will avoid the deed of separation. A class of authorities are invoked on this point relating to the legitimacy of a child claiming as heir, and the strong legal presumption which obtains in that case in favor of legitimacy, is sought to be applied to the case at bar. On this subject it may be well to inquire what this reconciliation is, which avoids the deed, and the reason why it does so ? In Bright's Husband and Wife, p. 349, it is said : " If after separation the husband and wife be reconciled and live together, that circumstance will avoid the deed or articles." In the case at bar, the evidence is, and such is the finding of the Court, that they continued to live separately, and had never lived together since the deed of separation. The reason of the principle is this, that the object, nature, and consideration of the deed is to provide a maintenance for the wife while living separately from the husband, but if they are reconciled, and live together without any new arrangement, the husband being bound under such circumstances to provide for the wife, and the law compelling him so to do, the consideration of the deed of separation fails—its object is at an end, and the former relations between the parties are resumed.

It is obvious that, upon principle, the reconciliation, to avoid a deed of separation, must be a permanent reconciliation, and a living together in the restored relation of husband and wife. Even a casual intercourse, and repeated declarations of a desire to return to their former state, will not answer. The case of Hyer *v.* Burger, 1 Hoffman's Chan. Rep., p. 1, is an illustration of the principle.

The only testimony on this subject was that of one witness, who stated that in November, A. D. 1852, he returned here from the Atlantic States, and then heard that Mrs. Stout had a child during that summer. She was living at San Luis Obispo with her brother, at the time. The witness also gave the name of the reputed father of the child.

Now, the complaint was filed on the twenty-fourth of October, A. D. 1851. On the twenty-seventh of December, A. D. 1852, a decree *pro confesso* was taken against William Stout.

The answer of such of the defendants as answered, was filed on the fourteenth of July, A. D. 1854.

The answer does not pretend to set up the fact of reconciliation in avoidance of the deed, (even if the defendants could set up this defence in the face of the implied recognition of the deed by William Stout, the only party who stands in such a position as to enable him to contest it on this ground.)

The rule invoked, and the authorities cited, apply only to cases of heirship. They have no application to the relations of the parties. It is a peculiar rule made by the law, in order to save

the opprobrium and disgrace of bastardy, and to supply the great deficiency of proof in regard to legitimacy.

FIELD, J., after stating the facts, delivered the opinion of the Court—TERRY, C. J., and BURNETT, J., concurring.

To the judgment, the appellants urge various objections : *first*, the impolicy of upholding voluntary separations between husband and wife ; *second*, the illegality of the contract under the civil law ; *third*, the invalidity of the trust for want of acceptance by the trustee ; *fourth*, title in the defendants, or those under whom they hold by virtue of the sale and judgment of April, 1850 ; *fifth*, want of registration of the deed, and consequent absence of notice to the purchasers under the sheriff's sale ; and *sixth*, subsequent reconciliation and cohabitation between the husband and wife.

It is admitted by the counsel of the appellants that deeds of separation between husband and wife have been upheld by the Courts of Chancery in England, but it is insisted that this has been done with expressions of regret by the later Judges that they have felt themselves bound by previous adjudications, as otherwise they would not have hesitated to pronounce such agreements void as against the policy of the law.    Our attention is particularly called to the observations of Lord Eldon, in the celebrated case of Lord St. John v. Lady St. John.    (11 Vesey, 526.)   In that case Lord Eldon doubted whether such agreements could be the foundation of either action or specific performance, and said : " That doubt has long had place in my mind. If this were *res integra*, untouched by *dictum* or decision, I would not have permitted such a covenant to be the foundation of an action, or a suit in this Court.    But if *dicta* have followed *dicta*, or decision has followed decision, to the extent of settling the law, I cannot, upon any doubt of mine as to what ought originally to have been the decision, shake what is the settled law upon the subject."   The same opinion was reiterated by the Chancellor several years afterwards, in the case of The Earl of Westmeath v. The Countess of Westmeath.    Previous to the decision in Lord St. John v. Lady St. John, agreements of this kind, made through the intervention of a trustee, were upheld in a great variety of cases, and notwithstanding the observations of Eldon, the law seems to have undergone no change.    Indeed, it is settled by an unbroken series of decisions, from Seeling v. Crawley, decided by the Master of the Rolls in 1700, (2 Vernon, 385,) to Wilson v. Wilson, decided by the Vice-Chancellor in 1845, (14 Simons, 405,) that agreements of this nature are valid, and not liable to the objection that they are against sound principles of policy.

Those who feel an interest in the investigation of the subject will find a citation of the English authorities in the opinion of

the Vice-Chancellor in Wilson v. Wilson, and will find it diffi-
cult, after their examination, to dissent from his judgment "that
the matter is concluded by authority."

And the law in the United States is equally well settled as in
England, as will appear by reference to some of the principal
cases in which the question has arisen.   In Carson v. Murray,
(3 Paige, 483,) Chancellor Walworth said:

"It has, however, long since become the settled law in Eng-
land, that a valid agreement for an immediate separation be-
tween a husband and wife, and for a separate allowance for her
support, may be made through the medium of a trustee; and, as
many of the decisions which have gone the greatest length on
this subject took place previous to the Revolution, they have
been recognized here as settling the law in this State (New
York) to the same extent."

In Nichols v. Palmer, (5 Day, 47,) the Supreme Court of Con-
necticut held such agreements valid, and Smith, J., in his opinion
in the case, said: "Contracts between the husband and some
third person, for the separate maintenance of the wife, have the
uniform sanction of the Courts, in *England*, from the earliest
period of their jurisprudence, and is a part of the ancient com-
mon law.   In this country, it is believed, that our ancestors have
been in the habit of making similar arrangements, from the first
settlement of the country; and many exist at this time, in vari-
ous parts of the State, which have been made in pursuance of
this usage.   Such being the common law of *England* at the time
our ancestors emigrated from that country, and such having
been the usage in this country ever since, it ought now to be
binding on our Courts as the common law of the land."

In Hutton v. Day, (3 Barr, Penn., 100,) the article of agreement
was entered into without the intervention of a trustee, and the
wife, after the death of her husband, sought to invalidate it, and
recover the portion of his estate which she had relinquished by
the article; but the Supreme Court of Pennsylvania upheld the
contract as having been *consummated*, and in its opinion, said:

"Deeds for the separation of husband and wife are valid and
effectual, both at law and in equity, provided their object be
actual and immediate, and not a contingent or future separation.
This distinction runs through all the cases, and, although the
wisest Judges have frequently asserted that deeds of separation
are at variance with the policy of the law, it is now too firmly
settled to be shaken.   The agreement here contemplates an im-
mediate separation; it was carried into effect in good faith by
the husband; has nothing unreasonable in it; and, consequently,
the wife, after the death of the husband, is not entitled to the
aid of the Court in any attempt to violate it."

In Battle v. Wilson, (14 Ohio, 257,) the Supreme Court of Ohio
held that articles of separation, through the medium of a trustee,

32

where the separation takes place, are not void, as against public policy.

In Chapman v. Gray, (8 Geo., 341,) the Supreme Court of Georgia, after an extended consideration of the English and American cases, sustained the validity of an agreement of separation. Mr. Justice Lumpkin, in delivering the opinion of the Court, expressed doubts as to the policy and morality of voluntary separations, but considered the law on the subject too well settled to be departed from.

In Reed v. Beazley, (1 Blackford, 97,) the Supreme Court of Indiana upheld the agreement, and to the objection that the contract was void, as against the policy of the law, said : " that contracts of this nature are supported by a long train of *English* decisions; *and we are satisfied that it comports with good policy to act in conformity with those decisions.* How much soever we may regret the unhappy state of society that renders articles of this nature necessary, we see no reason to regret that such contracts, so far as they provide for the maintenance of the wife, are considered obligatory."

From these authorities, and others to the same effect might be cited, it is clear that, by the settled law in the United States, such agreements are not invalid, because against sound principles of policy, and are upheld and enforced, when entered into through the intervention of a trustee, if followed by immediate separation, or, if separation has previously taken place.

The second objection urged upon our attention, is the illegality of the contract under the civil law. The deed was executed on the sixteenth of February, 1850. The common law, as a rule of decision, was not adopted until April 13, 1850, and by an act passed April 22, 1850, all laws in force in this State, except those passed at the first session of the Legislature, were repealed, with a proviso that all rights acquired, *contracts made,* or suits pending, should not be affected thereby. It is contended, therefore, that the validity of the agreement in suit must be determined by the civil law in force in California at the date of its execution, and that by the civil law it is a nullity.

The briefs of counsel are exceedingly barren of references to authorities as to the Mexican civil law, and furnish little aid to the Court in its investigation. It is true that the Court is bound to take judicial notice of the general laws *in force* in this State at the cession of California which remained unrepealed until the act of April, 1850. Those laws are not regarded as foreign, so as to require proof of their existence, and counsel seem to have contented themselves with this circumstance and general assertions as to their character, with few citations of text-books or judicial decisions.

In 14 Merlin, title 5, § 25, " of the contract of marriage," the doctrine of the civil law is laid down as follows :

" There can be no derogation from the power of the husband over the person of his wife. So that the agreement by which the wife would be authorized, in case of incompatibility of temper, to live separate from her husband, or the husband to live separate from his wife, would be null, and of no effect."

The nullity of the agreement for separation may be admitted, and the conclusion does not follow that the husband may not be bound to pay an annuity in consideration of being indemnified against the support and debts of his wife. The covenants for separation will not be enforced, either in the English or American Courts, and yet full force is given to the collateral covenants of the husband and trustee. (2 Story's Equity, § 1428.) So, in the civil law, contracts by the husband for the maintenance of the wife will be upheld like any other contracts, if made upon sufficient consideration, between parties capable of contracting.

In Labbe's Heirs *v.* Abbot et al., (2 La., 554,) the validity of an agreement between husband and wife for a division of the common property upon a voluntary separation was upheld. In that case, it appeared that in 1781 the parties entered into a marriage contract, by which they formed a community of property. Upon this contract they were married, and lived together until 1805, " when they entered into a voluntary agreement to separate, and to live separate, both in person and property." The act of separation was drawn up, and signed by the parties, and acknowledged before an officer exercising at the time the functions of judge and notary. The common property was then divided, and from that time until the death of the wife, the parties lived separately, and used and enjoyed separately the property assigned to them respectively. On the death of the wife, her heirs brought suit against the husband for an account, alleging that the community of property never ceased to exist between the husband and wife, notwithstanding they lived separately, and had divided their property at the separation; and the principal question of law raised in the case was, whether the act of separation of goods, and dissolution of the community, was valid and binding on the parties in any respect, according to the laws in force in the country at the time of its execution. On the argument, it was urged by the plaintiffs, that a voluntary separation of husband and wife was not permitted by the Spanish laws, and such separation did not put an end to the community of property; but the Court, in deciding the case, said :

" For a solution of the first two of these questions, we must resort to the Spanish laws, which afford the only *legitimate* rules by which the acts of the parties are to be construed. According to these laws, it is clear that husband and wife were considered so far separate persons, that they could validly enter into any onerous contracts between themselves. A sale is the example given to illustrate this doctrine. They seem to have been pro-

hibited only from making donations to each other, during the marriage, of property actually in possession. * * The contract by which Descuirs and his wife agreed, in 1805, to a separation of property, and dissolution of the matrimonial community which had previously existed between them, may be considered as partaking strongly of a contract of exchange, by which each one of the parties gave up his common right or claim to all the property, in consideration of his having obtained a separate and distinct title to a part. It was, strictly speaking, a partition of common property, and can not be assimilated to a donation. It is well known, that contracts of exchange, and agreements to divide a common property, create many obligations between the parties to such contracts, very similar to those which arise out of the contract of sale. We, therefore, conclude that the contract of 1805, did operate a good and valid separation of goods between the contracting parties, and dissolution of the community which previously subsisted between them, and a consequent mutual renunciation of any community of acquets and gains which may have been acquired subsequent to that period, by the parties to the contract. It can not be considered as having produced a legal separation, *a mensa et thoro.* The husband would probably have been obliged to provide for the maintenance of his wife, or to have afforded her bed and board, had she required it at his hands. It is true, the testimony shows that, after the execution of this contract, a voluntary separation of persons took place between the parties; but we have no evidence of any violence, or actual constraint, exercised by the husband or his wife." * * "*Having been made by parties capable of contracting, and by mutual consent,* it should be held as valid, *in toto,* unless some of its provisions contained stipulations reprobated by law."

We can see no distinction in principle between this case and the one at bar. The collateral contract, made with a view to carry into effect a previous agreement to live separately, is upheld, because made by parties capable of contracting, and upon a valid consideration. In the present case, there is sufficient consideration in the covenant of indemnity, on the part of the trustee, against the debts of the wife, to uphold the covenants and conveyance by her husband.

Such a person as a trustee is unknown to the civil law, and contracts termed *onerous,* such as contracts of sale, exchange, and lease, can be made directly between husband and wife, and of course between husband and a third party. So far, then, as the collateral undertakings are concerned, we do not find anything in the civil law which would invalidate them and prevent their enforcement.

This disposition of the objection renders it unnecessary to consider the very interesting question, how far the civil law can be deemed to have been in force after the treaty of Guadalupe Hi-

dalgo, under the very peculiar and unprecedented condition of California at the time.

The third objection urged for a reversal of the decree is, the invalidity of the trust for want of acceptance by the trustee. The deed was delivered to the trustee, and by him signed, and subsequently left in the possession of his counsel, without any direction as to its disposition. Some weeks afterwards, the deed was placed on record, and subsequently the trustee informed an applicant for a lease of the premises that they were held by him, in trust, for Mrs. Stout. His execution and detention of the instrument, taken in connection with the fact of his previous agreement to accept the trust, and his subsequent declarations, leave no doubt of the acceptance by him. The husband and wife both immediately acted upon the deed. They lived separately, and no complaint is made by the husband of any expenses having been incurred by his wife for which he has been charged. He was personally served with process in this suit, and allowed judgment by default to pass against him.

The defendants who answered the complaint, claim the premises under the sale made upon the execution issued on the judgment against William Stout. There is no evidence that the debt for which this judgment was confessed existed previous to the first of April, 1850. The statute in relation to fraudulent conveyances was not passed until April 19th, 1850, and neither by the civil law or the statute of this state is the provision for the wife fraudulent as against the judgment-creditor, the judgment having been confessed for a debt contracted subsequent to the execution of the deed. Under the statute, and by the civil law, a conveyance for family or wife is valid as against subsequent creditors, provided the husband is solvent at the time. In the present case, no question is raised as to the solvency of William Stout at the date of the deed.

It is unnecessary to consider the objection that there was no such registration of the deed as imparted notice to the purchaser at the sheriff's sale, and those who claim under him, as no title passed by that sale. The judgment, though rendered on the 19th of April, 1850, was not signed by the District Judge until June 8, 1850.

By the act to organize the District Courts, passed March 16, 1850, no process or execution could issue upon any judgment or decree of the Court until signed by the Judge. The thirty-first section of the act reads as follows: "It shall be the duty of the clerk of the District Court to draw up each day's proceedings at full length, and the same shall be publicly read in open Court, and corrected when necessary; after which they shall be signed by the Judge thereof, *and no process or execution shall issue on any judgment or decree of the Court until it has been so read and signed.*" The execution upon which the sale was made, issued April 26,

1850, and the sale was made May 27, 1850, both before the judgment was signed. The whole proceeding was null and void. (Bairre *v.* Dana, 20 John., 307; Burrill's Prac., 243.) In New York a statute (2 R. S., 360, § 11,) provided that no judgment should be deemed valid so as to authorize any proceedings thereon until the record was signed and filed; and in Butler *v.* Lewis, (10 Wend., 544,) a record not signed by the proper officer was set aside, and a motion to allow the record to be signed *nunc pro tunc* was refused. In the opinion given upon the decision of the case, Mr. Justice Nelson said:

" The record in this case has no more validity than if the attorney had filed it when it came from the hands of his clerk; it is mere blank paper, so far as the judgment is concerned. The release of all errors in the warrants of attorney and pleas can not cure the defect." The defendants claiming under the deed from the sheriff are chargeable with notice of the defects in the judgment. A notice of *lis pendens* was filed in the recorder's office in May, 1854, and the present holders of the premises all purchased with notice of this litigation, and voluntarily took upon themselves its risks.

The objection of subsequent reconciliation and cohabitation between the husband and wife is unsupported by the evidence in the case, and the point would not merit notice but from the fact that it was the basis of the previous decision of this Court. It is admitted that if parties, after separation, become reconciled and live together, that fact will avoid the deed. (Bright's Husband and Wife, 349.) The reason of the doctrine is obvious. The object of the deed is to provide for the maintenance of the wife whilst living separately from her husband; but, if reconciliation and cohabitation take place, her maintenance being obligatory upon him, the consideration of the deed fails. The argument of appellant is as follows: Mrs. Stout had a child in 1852, and there is no proof of her husband's absence from the State at any time after the execution of the deed; access must therefore be presumed; access is proof of reconciliation, and reconciliation avoids the deed. The argument assumes as a fact that Mrs. Stout gave birth to a child in 1852; but of this there is no legal evidence. The only evidence is mere hearsay, and this connects with the birth of the child the name of its reputed father. From a report of this nature no presumption of access to the husband can arise.

But assuming access to have been proved, it does not follow that it was the consequence of such a reconciliation as would avoid the deed. To effect this end, the reconciliation must be permanent, and be followed by cohabitation. It must be a reconciliation which restores the former relations of the parties. (Hyer *v.* Bruger, Hoffman Chan. Rep.)

There was no cohabitation between the parties in the present case; none is pretended.

The rule as to the presumption of access, cited in the former opinion of this Court, applies only to cases affecting children, and has no application to the parties. It is a rule, founded in policy, out of tenderness to the heirs, to avoid embarrassing questions of legitimacy, and prevent confusion in determining the succession of estates.

Judgment affirmed.