# THE BUTTE CANAL AND DITCH COMPANY *v.* VAUGHN.

Where water from an artificial ditch is turned into a natural water course, and mingled with natural waters of the stream, for the purpose of conducting it to another point to be there used, it is not thereby abandoned, but may be taken out and used by the party thus conducting it, so that he do not, in so doing, diminish . the quantity of the natural waters of the stream, to the injury of those who have previously appropriated such natural waters.

The burden of proof devolves on the party thus mingling the water belonging to him with that appropriated by others. He can only claim such quantity to which he establishes his right by decisive proof. The enforcement of his right must leave the opposite party in the use of the full quantity to which he was originally entitled.

The first appropriator of the water of a stream passing through the public lands in the State has the right to insist that the water shall be subject to his use and enjoyment to the extent of his original appropriation, and that its quality shall not be impaired so as to defeat the purposes of its appropriation. To this extent his rights go, and no further. In subordination to those rights, subsequent appropriators may make such use of the channel of the stream as they think proper, and they may mingle its waters with other waters, and divert an equal quantity, as often as they choose.

APPEAL from the District Court of the Fifth Judicial District, County of Amador.

This was an action for the diversion of the waters of the South fork of Jackson creek in the County of Amador. Plaintiffs claimed under the first appropriator of the waters of said stream. Defendant in his answer set up a right to a portion of the water, by virtue of a contract with the owners of the Amador County canal, which drained the North fork of the Mokelumne river. From this canal, the water claimed by defendant was emptied into a natural ravine, and from thence flowed into the South fork of Jackson creek, above the dam of plaintiffs, and after descending the stream for a mile, was again taken up at a point above plaintiffs' dam and diverted through defendant's ditch to his mining ground. Plaintiffs demurred to this portion of the defendant's answer as *new matter*. The demurrer was sustained by the Court below, and the defendant appealed. The material facts sufficiently appear in the opinion of the Court.

*W. W. Cope* for Appellant.

This case in its material features is precisely similar to that of Hoffman *et al. v.* Stone *et al.*, 7 Cal. R. 46. There is no question as to

the fact of priority; but the appellants, who were the defendants in the Court below, contend that they had the right to divert from said stream a quantity of water equal to that turned in for their use from the "Amador County canal." The ditch of the defendants was constructed in pursuance of a contract with the owner of that canal for a supply of water, and the channel of said stream was *adopted* and *used* as a *connecting link* between the two, and as a *medium* for the conveyance of water from one to the other. The water turned into said stream was derived from a foreign source; it was turned in subsequent to the construction of the ditch of the defendants, and for the sole purpose of supplying that ditch. It was not *abandoned*, nor was the *possession* of it *lost* even for a moment.

The principal difference between this case and that of Hoffman *et al. v.* Stone *et al.*, consists in the fact that the water in this case, when turned into the creek, mingled with other water flowing therein, to the use of which the plaintiffs had the prior right. But the decision in that case indicates very clearly the immateriality of this difference. It settles a point of considerable importance in this case, that a mere prior right to the use of the water of a stream, does not entitle the party having such right to the exclusive use of the channel of the stream. A reasonable use may be made of such channel by any other person, and it would seem to follow, that *any use* must be regarded as reasonable from which no *actual damage* results to the prior appropriator.

If that case was correctly decided, the judgment in this must be reversed, or if affirmed, must be affirmed upon grounds purely technical. The only question is as to the effect upon the respective rights of the parties of the *mingling* of these separate bodies of water, by the voluntary act of the defendants. It is true, the identity of the water turned into the creek was destroyed by the *mingling* of such water with the natural water of the stream. But does it therefore follow, the whole was subjected to the prior rights of the plaintiffs? In the case of a *confusion* of goods, where one person willfully and without consent mixes his goods with those of another, so that they cannot be distinguished, the law gives the entire property to the injured party. But this is a rule of necessity, and is carried no farther

than necessity requires.  If the goods mixed are of the same kind, and of equal value, each party takes his given quantity, and neither is entitled to the whole.  2 Kent's Com. 437 ; 15 Ves. 442.

The attention of the Court is particularly requested to the case in 15 Vesey.  The rule there stated appears to me to be peculiarly applicable to a case like the present.

Eddy *v.* Simpson, 3 Cal. R. 249, and Kelley *v.* Natoma Water Co., 6 Cal. R. 105, are not authorities in this case.  The decision in both of these cases proceeded upon the ground of *abandonment* alone, whereas in this case no such question exists or can arise.

The decision in Hoffman *et al. v.* Stone *et al.* is confidently relied upon by the appellants as governing this case.

*Robinson, Beatty & Heacock* for Respondents.

The plaintiffs claim that all the water in South Jackson creek belonged to them, as first appropriators ; that if any one negligently or willfully mingled other water with their water, they (plaintiffs) were entitled to the whole.  The plaintiffs rely, with confidence, on the case of Eddy *v.* Simpson, 3 Cal. R. 249, to sustain the judgment of the Court below.  The case of Kelley *v.* Natoma Water Co., 6 Cal. R. 185, is to the same effect.  The latter case, however, has other facts mixed up with it, and other principles discussed, and among other things the doctrine of " relation."  The case of Eddy *v.* Simpson has but one proposition in it, and we will examine that case, and endeavor to show that it does not in any one particular differ from the case now under discussion.  We will further endeavor to show that that case is founded on the soundest principles of law, and ought to be sustained.

Appellants contend that this case differs from Eddy's case, in this particular—that in Eddy's case the water escaped, and flowed first into plaintiff's creek, and after it had flowed into the creek, defendants erected their dam to take it out; whereas, in this case, defendants erected their dam and ditch to take out the water before they had turned it in.

Now, the time at which the ditch was dug to take out the water, in either case, could make no difference, unless the question of abandon-

ment had arisen; it might then have thrown some light on the intention of the parties. The digging of the ditch beforehand would clearly show that the party thus digging the ditch did not intend to abandon the water he was turning in above. If then, the case of Eddy *v.* Simpson turned on the question of technical intentional abandonment, and it was on that ground that the Court sustained the action in that case, we admit that our authority is not in point. But if it turned on any other point than technical voluntary abandonment, then we think the case of Eddy *v.* Simpson is directly to the point. The difference of facts in the two cases could not upon any other principle be material.

How do the appellants in this case come to the conclusion that the case of Eddy *v.* Simpson was decided on the doctrine of abandonment? Neither the word abandon nor abandonment, nor in fact, any word of similar import is used, either by this Court in their opinion, nor by either of the counsel in their briefs, nor by the Judge of the Court below in his instructions.

The Court decides one doctrine clearly; that is, that the use of water is only usufructory; that the defendants having suffered the water to escape from where they used it, and to mingle with water where plaintiffs were using it, it all became subject to the use of plaintiffs.

In this case, say the appellants, we did not suffer our water to escape, but we intentionally turned it into plaintiffs' water. They contend that having turned the water in willfully, they have greater rights than if it had escaped without their consent. In the case where the water had *escaped*, why could not the party who originally appropriated it take it up again, after its escape? Undoubtedly not; because it had, after its escape, mingled with the water of another, and they could not separate it. There is no law which hinders a man from pursuing the property which has escaped from him. If he has only a usufructory interest, still he may pursue, to enjoy that interest. In the case of Eddy *v.* Simpson, no one will deny that, after the water which was brought to Cherokee Corral, by the defendants, and there used by them, had escaped from them, they might have pursued that same water, erected dams and reservoirs, and taken it up again, at

any point before it mingled with water used by another.    They might have retaken it anywhere on the flats, and in the natural dry ravines, before it mingled with the water of Shady Creek.    They did not lose the water then, irrevocably, by letting it escape.    After an ordinary escape they had the right of recapture, or new appropriation.    But they had lost it by letting it mingle with water appropriated by another.    The reason is, the law will not attempt to make impracticable divisions.    If one voluntarily mixes his property with that of another, ordinarily he loses the whole.    And this rule is enforced with more rigor against the person who voluntarily and willfully makes the confusion, than against one who does it accidentally or negligently. See Kent's Com. 365, margin, 437, 8th edition, note 1.

But in either case a division is refused, on the ground that it would be impracticable to tell what portion belongs to each of the parties, and the one who is faultless will not be subjected to a division in which, from the uncertainty of human testimony, and the impossibility of Courts doing exact justice, he might suffer a loss.    If he is not in fault, he will not be subjected to any risk.    The doctrine upon the subject of confusion of goods is well settled : that he who willfully mixes his goods with those of another loses the whole, except in the single instance where goods mixed are of the same quality, and are capable of being measured by some just standard, as wheat by the bushel, flour by the pound, wine by the gallon, etc., and in such cases, if the quantity mixed can be ascertained, then the wrong-doer may have his wheat, wine, or flour restored to him by measure, because it can make no difference to the innocent party whether he has the same identical grains of wheat, or drops of wine, which he originally had, provided he has the same quantity and quality.    But the very moment it becomes impossible to make a decision, and do the innocent party certain justice—when the division can only be guessed at, or any injury has resulted to the innocent party from the admixture, then the wrong-doer forfeits the whole.    We refer to the following authorities on this head : 2 Kent's Com. 365 ; Willard *v.* Rice, 11 Metcalf ; Breckinridge *v.* Holland, 2 Blackford's Ind. R. 377.

In regard to the application of this rule to the use of the water, we think that we can show that it applies with more force than to any other class of property.

In the first place, running water is incapable of accurate admeasurement; at least, no accurate means of admeasurement are in use among miners. It is true, they do measure by the square inch; but then a square-inch tube, with one foot head, would only carry half as much water as the same tube with four feet head, and one-third as much as with nine feet head, etc., that is, in proportion to the square root of the height.

But the difficulty of admeasurement is the smallest of the objections attending such confusion of water. If one party, after having conducted his water for some distance through artificial channels, and used it for mining purposes, turns it into a natural stream which has been appropriated by another, he of course empties mud and sediment with the water, and thereby injures the quality of the water in the natural stream. The quantity added would not, as a general rule, more than compensate for the depreciation of the quality.

Another difficulty is this: suppose water be turned into a creek at its head, which will fill a certain orifice, with a certain pressure; it runs down the creek say five or ten miles; now, how are you to measure it when it is taken out? During that five or ten miles, of course, there is a great loss by evaporation, leakage, sinking into the sand, etc. If you measure at the taking out in the same way as when it was let in, you make the innocent party, who first appropriated the creek, sustain all the loss of the wrong-doer. If you allow a per centage for loss, what will it be? The loss would be much greater in some cases than in others. Running over a gravelly bottom, in some cases, the loss would be fifty or seventy-five per cent., perhaps, in five miles. In other cases, with a narrow, shaded channel, and a compact rock bottom, the loss would not be ten per cent. in ten miles. But there is still another and greater difficulty, practically, than all we have yet mentioned. All men who have dug ditches from small creeks, have been in the habit of using their dams, at the head of the ditch, to accumulate water during the night, to be used during the day. Usually, these dams have filled up during the night. If, after the water is turned in, the dam soon fills up and runs over, much water is wasted during the night. Both parties commence using water out of the dam, or reservoir, in the morning, and it is soon emptied. All these

things would make the equitable division of the water so difficult, that it would be impossible for the most equitable and right-minded persons to make a satisfactory division.

It was suggested, on the argument of this cause, that the doctrine of confusion of goods did not apply to this case, because plaintiffs did not own the water, and only had a unsufructory right in it.    Well, that is a *special* property.    They had a right to it, with all the rights pertaining to property, so long as it was in their possession.    They have the same right to protection, so long as the water is being used by them, that they would have in the use of property absolutely belonging to them.    The injury is done to them before they have parted with the water.    For the time being, they are the *quasi* owners. To show that the doctrine of confusion applies not only to the case of absolute property, but also to cases where there is only a qualified property, we refer to the case of Willard *v.* Rice *et al.*, 11 Metcalf's Mass. Rep. 493.

The case in 15 Vesey, to which appellants refer, fully carries out the doctrine for which we contend in regard to confusion of goods.

FIELD, J., delivered the opinion of the Court—TERRY, C. J., and BALDWIN, J., concurring.

The plaintiffs claim, under the first appropriators, the right to the waters of the South fork of Jackson creek, in the County of Amador, and previous to and at the time of the diversion by the defendants, which is the occasion of this suit, were the owners of a line of ditch and of flumes and aqueducts, into which, by means of a dam constructed across the stream, they diverted the waters from the natural channel of the fork, and conducted the same to adjacent mining ground to be used for mining purposes.

The defendants are the owners and in possession of valuable mining ground situated on the north side of the fork, and are endeavoring to obtain the requisite supply of water for its successful working from the North fork of the Mokelumne river and its tributaries, through the Amador County canal, under a contract with the owners of the canal.    For that purpose the water is conducted from the canal by artificial channels to a natural gulch or ravine, from which it is emp

tied into the South fork of Jackson creek, above the dam of the plaintiffs. About a mile below the point where the water is thus emptied, the defendants have constructed a ditch leading to their mining ground, into which, by means of a dam at its head thrown across the fork, they divert a portion of the waters flowing in the channel, and it is this diversion which is the subject of complaint in this suit. The quantity of water diverted does not equal the quantity emptied into the fork from the Amador County canal through the ravine or gulch designated. Upon these facts the single question is presented whether the defendants, after the mingling of the water conducted by them from the canal with the waters naturally flowing in the fork, possess the right to take out an equal or less quantity from the stream, or is the right of the defendants to the use of the water whilst in the ravine, or to the use of an equal quantity, lost by its subsequent mingling with the natural waters of the fork?

This case is similar in its material features to that of Hoffman *et al. v.* Stone *et al.* (7 Cal. 46). In that case the plaintiffs were the prior appropriators, and as such entitled to the waters of a stream called Dutch gulch, the channel of which was dry at certain seasons of the year. This channel the defendants used as a connecting link between two canals constructed by them, emptying their waters by one canal into the channel, and subsequently diverting them by means of a dam into the other. The plaintiffs in that case, who were the owners of a ditch which received its supply of water from the creek, obtained a judgment perpetually enjoining the defendants from diverting the water from the main channel so as to prevent it from flowing down to the extent of the capacity of their ditch. But on appeal the judgment was reversed, and this Court, per Murray, C. J., said:

" The plaintiffs being the prior locators, it would follow that any interference with the waters of Dutch gulch would be an infraction of their rights. But the appropriation of the waters did not give them the exclusive use of the bed of the stream. We see no reason why it might not be used by others as a channel for conducting water, so long as it did not interfere with their rights. If the defendants were diverting the natural water of the stream, as well as that brought into it by themselves, then the plaintiff would have a just cause of complaint."

In the case at the bar the channel of the South fork of Jackson creek is used as a connecting link between the Amador County canal and the ditch of the defendants.   The water from the canal is emptied into the fork with no intention of abandoning its use, but for the sole purpose of supplying the ditch.   The principal difference between this case and that of Hoffman *v.* Stone, is the mingling of the water introduced by the defendants with the waters of the creek.   In that case the channel of the stream was dry in certain seasons of the year, and at the time the suit was brought there was no natural water flowing in it.   But it does not appear that this circumstance had any controlling influence upon the decision.   The point settled in that case is this: that the prior right to the use of the natural water of a stream does not entitle the owner of such a right to the exclusive use of the channel.   So long as his right is not interfered with, there is no reason why the bed of the stream may not be used by others as a channel for conducting water.   If the plaintiffs in the present case receive their full supply, as previous to the introduction of water by the defendants, they have no cause of complaint.

It does not necessarily follow that the water introduced by the defendants became subject to the use of the plaintiffs, because its identity was lost by being mingled with the water naturally flowing in the creek. The rights of the parties, after such mingling, are not unlike the rights of the owners of goods of equal value after their mixture—both are entitled to take their given quantity.   Where there is a confusion of goods willfully made by one owner, without the consent of the other, so that it becomes impossible to distinguish what belongs to each, the common law gives the entire property to the injured party.   " But this rule," says Kent, " is carried no further than necessity requires ; and if the goods can be easily distinguished and separated, as articles of furniture, for instance, then no change of property takes place.   So, if the corn or flour mixed together *were of equal value, then the injured party takes his given quantity and not the whole.*"   (Coms., 2d vol., 365 ; Lupton *v.* White, 15 Vesey, 442.)

The plaintiffs rely, with apparent confidence, upon the case of Eddy *v.* Simpson (3 Cal. 249).   In that case the plaintiffs were the prior appropriators of the water of Shady creek, having diverted the same

by a dam across the stream.    The defendants, by like means, obtained the water of Bloody Run and Grizzly cañon, which they brought to a place known as Cherokee corral, where, after its use, it passed from their possession and found its way, by natural channels and the natural level of the country, to Shady creek, at a point above the dam of the plaintiffs.    And when the defendants undertook to retake from Shady creek, a quantity of water equal to that which thus found its way into the channel, the Court held their rights to the water were gone. " When the water of Grizzly cañon and Bloody Run," said the Court, " left the possession of the defendants at Cherokee Corral, all right to and interest in that water was lost by the defendants.    It might be made the property of whomsoever chose to possess it.    Without the agency of the defendants, it found its way into Shady creek, joining the waters there in the possession of the plaintiffs, and became a part of the body of water used and possessed by them."

It is very evident that the Court considered the fact that the water had passed from the possession of the defendants, and found its way to Shady creek without their agency, as material circumstances of the case ; in other words, it regarded the water as having been abandoned. This is the view taken by Mr. Chief Justice Murray, when he notices the objection that Hoffman *v.* Stone was within the rule of that case ; for the reason he assigns, as an answer to the objection, is the finding of the jury that the water was not abandoned by the defendants, and left to find its way by natural channels into Dutch gulch, but was turned in by the defendants, making the gulch a connecting link of their ditch.

There may be some difficulty in cases like the present, in determining with exactness the quantity of water which parties are entitled to divert.    Similar difficulty exists in the case of a mixture of wheat and corn—the quantity to be taken by each owner must be a matter of evidence.    The Courts do not, however, refuse the consideration of such subjects, because of the complicated and embarrassing character of the questions to which they give rise.    If exact justice cannot be obtained, an approximation to it must be sought, care being taken that no injury is done to the innocent party.    The burden of proof rests with the party causing the mixture.    He must show clearly to what

portion he is entitled.   He can claim only such portion as is established by decisive proof.   The enforcement of his right must leave the opposite party in the use of the full quantity to which he was originally entitled.

Cases involving questions of analogous character and equal difficulty, are of frequent occurrence.   The illustration given by the defendants' counsel is in point.   A constructs a ditch, and appropriates a portion of the water of some stream for mining purposes; B subsequently constructs a ditch for a similar purpose, tapping the stream. A then enlarges his ditch, destroying the landmarks of its original capacity.   A dispute then arises between A and B, as to whether A is not diverting more water through his enlarged ditch, than he is entitled to by virtue of his first appropriation.   Here the quantity of water to which A and B are respectively entitled, becomes difficult of accurate adjustment; and if, instead of two, there be a greater number of ditches taking water from the same stream, questions respecting the conflicting rights of the parties become exceedingly complicated and embarrassing.   The Courts do not, however, as we have observed, refuse to entertain such questions; but endeavor to relieve them of their complication and embarrassment, and to mete out justice to all parties.   (Priest v. Union Canal Company, 6 Cal. 107, and White v. Todd's Valley Water Company, 8 Cal. 443.)   In Embrey et al. v. Owen, (4 Eng. Law and Equity, 470) Baron Alderson refers to a case in point.   "There was a case," says the Baron, "of Dakin v. Cornish, tried before me at Leeds, in 1845, where water was taken from the river Ayr to work a steam engine.   There was an artificial course from the river to a reservoir in the yard of a mill; the water was there mixed with other water obtained from the earth, the whole was then used for the steam engine, what remained was transferred into another tube and carried back to the river; and the question was whether this was an injury to some other mills lower down on the stream.   We took much care about the case, and I left it to the jury to say if the same quantity of water continued to run in the river, as if none of its water had ever entered the premises of the defendant, and if so, he was entitled to their verdict."

The first appropriator of the water of a stream passing through the

10

public lands in this State, has the right to insist that the water shall be subject to his use and enjoyment to the extent of his original appropriation, and that its quality shall not be impaired so as to defeat the purpose of its appropriation. To this extent his rights go, and no further. In subordination to these rights, subsequent appropriators may make such use of the channel of the stream as they think proper, and they may mingle with its waters other waters, and divert an equal quantity, as often as they choose. Whilst resting in the perfect enjoyment of their original rights, the first appropriators have no cause of complaint.

It follows that the Court below erred in sustaining the demurrer to the new matter set up in the answer, and the judgment rendered thereon must be reversed, and the cause remanded for further proceedings. Ordered accordingly.