[L. A. No. 1817. In Bank.—January 17, 1908.]

POMONA LAND AND WATER COMPANY et al., Respondents and Appellants, v. SAN ANTONIO WATER COMPANY et al., Appellants and Respondents.

WATER-RIGHTS—CONTRACT TO DIVIDE NATURAL FLOW OF STREAM—EXCESS WATER SAVED AND DEVELOPED BY CONTRACTING PARTY.—Where a contract is made for division of the natural flow of the waters of a creek at a dam, in certain specified proportions, any water saved from seepage or absorption by one of the contracting parties, or developed by such party, or its agent, above the point of division, which would not naturally flow thereto, is excess water belonging to such contracting party, or its vendee, and is not to be divided under the contract.

ID.—PERSONAL COVENANTS BETWEEN PREDECESSORS OF PARTIES—SHARING EXPENSE OF DEVELOPMENT WORK.—Personal covenants between the predecessors of the contracting parties, to share the expense of development work, which were not contained in the grants made by them to their respective grantees, did not run with the land, and cannot affect the contract made between the parties to this action, in regard to the division of the natural flow of the waters of the creek at the point of division agreed upon, and which is silent as to salvage or development of excess water.

ID.—DUTY OF COURT—FINDING AS TO EXTENT OF EXCESS.—The defendant being entitled to the excess water saved and developed by it, it was the duty of the court to make a finding as to the extent of percentage of such excess. The difficulty in ascertaining the percentage or excess of the water saved from seepage or absorption, or the quantity developed, to which the defendant is entitled, is one which must be met, and it must be determined with such exactness as may be possible.

ID.—JUDGMENT IN FAVOR OF RIPARIAN OWNER—GRANT TO DEFENDANTS—ADVERSE USE—PRESCRIPTIVE TITLE.—A former judgment in favor of a riparian owner must be considered in connection with the pleadings, and where it covered merely a user of twenty inches upon riparian land, without other interference with the natural flow of the water, and the rights of such riparian owner were passed to the defendant, which used none of such water upon the riparian land, but used the same adversely, and acquired a prescriptive title to eighteen inches thereof, as against the plaintiffs, which was adjudged in its favor by the court, in this action, such judgment must be affirmed.

CROSS-APPEALS from a judgment of the Superior Court of Los Angeles County. M. T. Allen, Judge.

The facts are stated in the opinion of the court.

Otis, Gregg & Surr, and H. W. O'Melveny, for Defendants, Appellants, and Respondents.

A. P. Nichols, J. S. Chapman, and Stephens & Stephens, for Plaintiffs, Respondents, and Appellants.

HENSHAW, J.—This is an action in form for an injunction to restrain the defendants from their alleged unlawful diversion of the waters of the San Antonio Creek. In its essence the action is to determine the conflicting claims of plaintiffs and of defendants to certain of these waters. The Pomona Land and Water Company represents the users of water to the west of San Antonio Creek—the "Pomona people." The San Antonio Water Company represents and supplies the lands and people to the east side of the creek—the "Ontario people." At a fixed point upon the stream a dam had been erected, and at this dam the waters which flowed thereto had, under agreement, been divided between the Pomona people and the Ontario people as follows: When the water which reached the dam amounted to or was less

than six hundred and twenty-four miner's inches, the supply was equally divided between the west-side and east-side users. When it exceeded six hundred and twenty-four inches the west-side users were entitled to three hundred and twelve inches and the east-side users to all of the rest. Over this there is no controversy.

By contract and deed between the Pomona Land and Water Company and the San Antonio Water Company, the water-rights of the former were conveyed to the latter, and the latter company agreed in effect to make distribution of the waters in the proportions above set forth.

The defendant, the Ontario Power Company, is a corporation created for the purpose of generating power. The San Antonio Water Company owns the lands riparian to the San Antonio Creek above the division dam, and granted permission by lease to the Ontario Power Company to do certain work and erect necessary structures to the end of developing power from the waters of San Antonio Creek above the division dam and before such waters reached the dam. Measurements of the natural flow of the stream were taken by these defendant corporations at a point two and a half miles above the division dam and again at the division dam, from which they became satisfied that from the upper point of measurement the stream was a losing stream, and that nineteen per cent of its surface flow was lost by seepage, percolation, and evaporation between that point and the division dam. In the belief, therefore, that its duty to plaintiffs was only to distribute to them their proportion of the natural flow of the water as it reached the division dam, the defendants held that any excess over the natural flow which they could save by impounding the waters two and a half miles above the division dam in a pipe-line and bringing it thus down to the division dam without waste, would be salvage water, rescued water, or developed water, the rightful use of which would be theirs absolutely. This then in fact is what was done. The Ontario Power Company impounded all the waters of the stream in a thirty-inch pipe-line and carried them down to their power-house above the dam. They leased in turn to the defendant San Antonio Water Company the salvage water, estimated at nineteen per cent of this natural flow. By plaintiffs and respondents it is insisted upon this appeal that the Ontario

Power Company is a mere agency in this regard of the San Antonio Water Company, and that its rights to this salvage water are no greater than are the rights of the San Antonio Water Company. The next contention is that it was the legal duty of the San Antonio Water Company, under certain agreements and contracts, hereinafter to be considered, to divide this salvage water with plaintiffs equally with the rest of the water of the stream at all times when the total amount of that water did not exceed six hundred and twenty-four inches.

For convenience, the Ontario Power Company may be dropped from the case, and the questions may be considered from the point of view for which plaintiffs and respondents contend,—that is to say, from the point of view of the rights and duties of the San Antonio Water Company.

The right to this salvage water, estimated by the San Antonio Water Company to be nineteen per cent of the natural flow, is the first matter in controversy between these parties. The amount of the water so saved, the court expressed itself unable to determine from the evidence. Under its view, however, that whatever the amount might be it should be divided under the contention of plaintiffs, it was unnecessary to determine the amount. If, however, the position of the defendant, the San Antonio Water Company, is correct, if it is entitled to this water, then an accurate finding upon this question becomes of extreme importance to all of the litigants.

After the natural flow of the stream had, as above described, been impounded in a pipe-line and carried down to the division dam, leaving the bed of the creek dry, the San Antonio Water Company undertook certain development work in the bed of the creek, laying a pipe-line in the saturated gravels, and thus rescuing, impounding, and using from twenty-five to fifty inches of water. As to this water, its position is the same as that which it takes with regard to the salvage water. It argues that, as it is delivering to plaintiffs all of their proportion of the natural flow to which alone they are entitled, all other waters which it may save or develop belong to it; that as it is giving to plaintiffs all of their proportion of the natural flow which by any possibility could reach the division dam, this water so rescued from the bed of the creek cannot be part of that, and although it comes

from the creek is newly developed water and their property. Upon this the court took plaintiffs' view, that under the agreements above adverted to, one half of this water belonged to plaintiffs whenever the total flow was less than six hundred and twenty-four inches, but that plaintiffs should bear one half of the cost of the development, estimated at seven hundred and fifty dollars. From the conclusion reached by the court upon both these matters and expressed in its judgment the defendants appeal.

Still a third matter of controversy exists between the parties, to which consideration must now be paid. One Dexter asserted the right to twenty inches of water for use upon his lands upon the east side of the creek, and in fact his right to this water was embodied in a judgment in litigation growing out of these very questions, a judgment to which all the parties to this action, their predecessors or representatives in interest were parties. In the contract between the Pomona Land and Water Company and the San Antonio Water Company, to which reference has heretofore been made, it is "agreed between the parties hereto that all the waters of San Antonio Creek, except the twenty inches of water owned by Richard Gird and known as the Dexter claim, have been for more than fifteen years last past owned and used equally in common by certain parties on the Ontario and Pomona sides of the San Antonio Creek," etc. And, further, it is declared "that after the execution of this agreement and of the deeds hereinafter mentioned all the waters of San Antonio Creek and its tributaries, excepting the so-called Dexter claim of twenty inches above referred to, shall be allowed to flow undiminished to said point of diversion" (the division dam). Dexter sold his land and water-right to Gird. Gird in turn, after the execution of this contract, sold both to the San Antonio Water Company. The San Antonio Water Company insists upon its right to take the Dexter twenty inches of water, which, it will be remembered, was water which for years had been diverted from the stream above the division dam. Respondents, upon the other hand, contend still by force of certain contracts, to which reference has been made, that upon the acquisition by the San Antonio Water Company of this Dexter claim, it became that corporation's duty to permit that twenty inches to flow to the dam and there to

be divided.  The court upon this found generally with the plaintiffs, to the effect that such was their right, but it found, moreover, that by adverse use for sufficient time the San Antonio Water Company had acquired a new title by prescription to eighteen inches of this water, and for that amount gave them judgment.  Upon this so-called Dexter claim there are cross-appeals, appeals by the plaintiffs from the judgment in favor of the defendants for the eighteen inches, and from the court's order denying its motion for a new trial, and upon the part of the defendants, who insist upon their title to the full twenty inches awarded to Dexter by the judgment above referred to.

1. Salvage and Developed Water.—It may not successfully be disputed that if, in fact, all the water to which plaintiffs were entitled was the one half of the natural flow of the stream as it reached the division dam, and that if in fact they receive this water, then the nineteen, or any other percentage, which was saved by the economical method of impounding the water above, and the twenty-five inches, more or less, which were rescued as developed water from the bed of the stream, were essentially new waters, the right to use and distribute which belonged to defendant.  This principle has been enunciated by this court as early as *Butte Company* v. *Vaughn*, 11 Cal. 143, [70 Am. Dec. 769], and has been reaffirmed, however varying the forms may have been, whenever it has been presented.  The principle in brief is this: that where one is entitled to the use of a given amount of water at a given point, he may not complain of any prior use made of the water which does not impair the quality or quantity to which he is entitled, and, upon the other hand, he may not lay claim to any excess of water over the amount to which he is entitled, however it may be produced.  In the Vaughn case, the question turned upon the prior use.  In *Creighton* v. *Kaweah Irrigating Co.*, 67 Cal. 222, [7 Pac. 659], it is said: "At best, the plaintiffs would be entitled only to have the defendant enjoined from obstructing the flow of that which would have naturally flowed unaided by artificial means, with which the plaintiff is not connected."  In *Wiggins* v. *Muscupiabe L. & W. Co.*, 113 Cal. 195, [54 Am. St. Rep. 337, 45 Pac. 164], this whole question is elaborately considered and full recognition is accorded of the right to water of one who saves as

well as of one who develops it. It there appeared that one hundred inches of water were lost by absorption and evaporation in passing through the natural channel from the dam and ditch of an upper riparian owner to the land of a lower owner. It was held that a court of equity in dividing the flow of the stream might allow the upper owner to provide artificial means for carrying all the waters of the stream in excess of the one hundred inches to the land of the lower owner, and permit the upper owner to use so much of the one hundred inches as he could save by such artificial means, and, quoting from the opinion, it is said: "The plaintiff could under no circumstances be entitled to the use of more water than would reach his land by the natural flow of the stream, and, if he receives this flow upon the land, it is immaterial to him whether it is received by means of the natural course of the stream or by artificial means. On the other hand, if the defendant is enabled by artificial means to give to the plaintiff all of the water he is entitled to receive, no reason can be assigned why it should not be permitted to divert from the stream where it enters its land and preserve and utilize the one hundred inches which would otherwise be lost by absorption." This same doctrine is recognized by all the courts which have been called upon to consider it. (*Platte Irrigation Co.* v. *Buckers, etc., Imp. Co.*, 25 Colo. 77 [53 Pac. 335]; *Herriman Irrigation Co.* v. *Butterfield Mining Co.*, 19 Utah, 453, [57 Pac. 541]; Farnham on Waters, sec. 672.)

Indeed, as we read plaintiffs' brief, we are led to believe that this doctrine is not disputed, but that, because of defendants' contractual obligations, it is insisted that plaintiffs are entitled to their share of this salvage and developed water. A consideration of these agreements is thus imposed.

At the outset it should perhaps be stated that none of these waters are used in virtue of riparian rights upon lands riparian to the stream, but are either diverted and consumed upon lands without its watershed, or used solely under claims by appropriation. In 1877, Loop and Meserve, owners of lands upon the west side of the stream and claiming water-rights in the stream, entered into an agreement with the Cucamonga Water Company, claiming water-rights in the stream for the use of lands and people on the east side thereof. At the

time of this agreement each of the contracting parties claimed by pre-existing rights and titles. The substance of the agreement was that at the division dam the water should be divided equally between the parties; that the parties should, at their joint expense, develop the waters of the stream from their source to the division dam; that the development work should proceed with reasonable diligence until completed. Each party to the contract agreed to supply out of his moiety such water as any other person upon his side of the stream was entitled to.

In August, 1882, Loop and Meserve, the west-side users, entered into a contract with Mills and Wicks, the substance of which agreement is that Loop and Meserve, reserving to themselves one miner's inch of water for every eight acres of their lands, which water Mills and Wicks agreed to deliver to them, conveyed to Mills and Wicks any excess water over that amount. Mills and Wicks agreed to do development work for the purpose of increasing the flow of the water. This obviously it was for the interest of Mills and Wicks to do, since the excess over the amount which was to go to Loop and Meserve was their own. It is to be remembered, however, that this agreement affected only the waters to which the west-side users were entitled, and in no way affected the waters of the east-side users. Moreover, time was made of the essence of the contract as to the work of development. A deed in consummation of the agreement was placed in escrow to be delivered upon the performance by Mills and Wicks of their part of the contract. The deed was placed in escrow and was delivered to Mills and Wicks in April, 1885, whereby it was established, as between the parties, that the covenants, the performance of which Mills and Wicks had undertaken, had been fully complied with, and thus Mills and Wicks were relieved from any obligation of making any further water developments. And finally there is established not only this complete performance by Mills and Wicks, but the contract does not attempt to impose the duty of any further or future developments upon the assigns of Mills and Wicks.

The Chaffeys had succeeded to the interest of the Cucamonga Water Company, and consequently to such transitive rights and duties as were imposed under the contract of 1877 with Loop and Meserve. In 1882 the Chaffeys in turn

CLII Cal.—40

made an agreement with Mills and Wicks, by which contract it was agreed that all the waters of the stream were to be allowed to run undisturbed to the division dam, where the waters were to be divided into two equal parts, which parts were to be taken by the respective parties to the contract. "At said dam all waters flowing into or over said dam shall be divided into two equal parts," etc. It was further agreed that all development of the cañon was to be at the joint and equal expense of the parties in accordance with their plans first agreed upon.

Subsequently, in December, 1882, Mills and Wicks conveyed their rights to the plaintiff, the Pomona Land and Water Company, while the defendant, the San Antonio Water Company, succeeded to all the rights of the Chaffeys. Then, finally, upon April 23, 1897, the plaintiff, the Pomona Land and Water Company, entered into an agreement with the defendant, the San Antonio Water Company, and in pursuance of that agreement conveyed its rights in the waters of the stream to the San Antonio Water Company. Thus the defendant, the San Antonio Water Company, has come to be the owner of all the rights in the waters formerly belonging to Mills and Wicks, the Chaffeys and the San Antonio Water Company. (It also acquired the Dexter right, as has been above stated, but that right is a matter for separate consideration.)

The agreement of the San Antonio Water Company with the Pomona Land and Water Company is the only agreement to which it is directly a party, and by which it can be legally bound. Of course, in taking the rights of the Pomona Company, as in taking the Chaffeys' rights, it took *cum onere* and subject to all the legal burdens which, by the express terms of the preceding contracts or by necessary implication of law, devolved upon it; and the especial obligation which plaintiffs insist was thus cast upon the San Antonio Company is that of the duty to do work of development to increase the flow of the water, which increased flow should be for the mutual benefit of the west-side and east-side users. Or that, if it were not the duty of the defendant to do such development work, still, if it did do it, the result is the same, and the plaintiffs acquire a right in the new water. But, if this is so, since the defendant, the San Antonio Water

Company, was not a party to any of the earlier contracts, and since no such obligation is in terms imposed upon it by its contract with the Pomona Land and Water Company, it must follow that these earlier contracts contained a covenant carrying with it the transitive quality of binding those who did not personally incur the obligation. But the covenants, and the only covenants which bear this quality, are covenants which run with the land, and the only covenants which run with the land are those which are found in sections 1462 et seq. of the Civil Code. "Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." Clearly, none of these earlier contracts contain any such covenant. (*Fresno Canal Co.* v. *Rowell,* 80 Cal. 118, [13 Am. St. Rep. 112, 22 Pac. 53].) There is no privity of estate or tenure here. There is no grant of an estate. Thus says Erle, J., in *Cole* v. *Hughes,* 54 N. Y. 444, [13 Am. Rep. 611] : "There is a wide difference between the transfer of the burden of a covenant running with the land and the benefit of the covenant, or, in other words, of the liability to fulfill the covenant, and the right to exact the fulfillment. The benefit will pass with the land to which it is incident; but the burden or liability will be confined to the original covenantor, unless the relation of privity of estate or tenure exists or is created between the covenantor and the covenantee at the time when the covenant is made." "The obligation of all contracts is ordinarily limited to those by whom they are made, and if privity of contract be dispensed with, its absence must be supplied by privity of estate." (1 Smith's Leading Cases, p. 178, note.) The covenants then touching this matter were not founded in grant, so there was no privity of estate between the parties at the time the covenants were made. They were merely personal covenants binding only upon the covenantors. In the contract of December, 1877, the provision as to development work was that it should be done at the joint expense of the parties and should proceed with reasonable diligence until completed. It cannot be said that such an agreement binds the defendant who was not a party nor privy to the contract, and whose development work was done thirty years after. So, too, as to the agreement made by the west-side

users with Mills and Wicks.  The development which Mills and Wicks were called upon by their contract to do they had done, and it was not incumbent upon them to do anything more.  In short, the rights and duties of the San Antonio Water Company are governed in this regard entirely by the contract which it made with the Pomona Land and Water Company.  That agreement makes provision for the three hundred and twelve inches which is to be diverted to the Pomona side under the conditions above stated (that is to say, no more than that, under any circumstances, and one half of the flow when the amount shall be less than six hundred and twenty-four inches), provides, after expressly excepting the Dexter claim of twenty inches, that "all the waters of San Antonio Creek and its tributaries shall be allowed to flow undiminished to said point of diversion"; provides that the San Antonio Water Company shall be entitled to all water in excess of the three hundred and twelve inches which is to be diverted to the Pomona side; contains the covenant upon the part of the San Antonio Water Company that it will "never by any development or works which it may or shall make or do in the San Antonio Cañon, or any of its tributaries, diminish the flow of water to said users below the said amount of three hundred and twelve inches which they are now and long have been entitled to receive"; provides that the waters shall be permitted to flow to said users as they are now and have been long permitted to flow, and nothing in the agreement shall enlarge or abridge the rights of the users of water; and San Antonio Water Company shall be under no higher or greater obligations to the users of water (represented by the Pomona Land and Water Company) under or by virtue of this agreement than it has been in the past, except to deliver water into the said Pomona conduit as herein directed.  Then finally it declares that "it is further understood and agreed between the parties hereto that if in future the party of the second part (the San Antonio Water Company) shall construct a pipe-line in said San Antonio Cañon, in such event said party of the second part herein shall deliver to the users of water hereinbefore referred to the water which said users of water are now, under and by virtue of said deeds and agreements, entitled to at the intake where now such users of water receive the water to which

they are entitled from the San Antonio Creek at the point known as the division dam." Having in mind the fact that the parties were and for years had been using the surface flow of the stream, and that surface flow only as and when it reached the division dam, that the contract provides for the uninterrupted or rather undiminished flow to the division dam, and that the water which is to be divided is the water then flowing at this point of division, the conclusion is irresistible that the plaintiffs' rights have become fixed, and are measured by their proportion of the natural flow of the stream when that flow reaches, without hindrance or diminution, the division dam. But this is a very different proposition from that contended for by plaintiffs, wherein they insist upon their proportionate share of any water over and above that natural flow which may be developed or saved. To such water we are of opinion that they show no right at all. There is not here involved any question of impairment of quality or quantity by the use of the pipe-line. The facts stand that by use of this pipe-line defendant brings down and delivers to plaintiffs the one half of the surface flow at the division dam to which they are entitled, and the circumstance that, in addition, the defendant rescues and devotes to beneficial use an additional quantity of water affords no grievance to the plaintiffs, so long as that additional quantity is determined with the nicest exactness possible.

We thus come to the question of how much water was actually saved by the pipe-line; that is to say, how much water in excess of that which would reach the division dam does the pipe-line carry, for to that excess defendant is clearly entitled. The defendant contends for nineteen per cent, and put in evidence the elaborate measurements which it made by clock-work, covering a period of some four months, and the testimony of competent engineers in explanation and support of those measurements. Upon this question the court found that the defendants have not saved nineteen per cent of the water; that the average measurement showed a saving of nineteen per cent; that the measurements did not show any uniform percentage of loss, but by many it appeared that the loss was greater than nineteen and by others that it was less, and that the percentages claimed to be saved varied from thirteen per cent to twenty-two per cent, and that

no fixed percentage would fairly represent the so-called salvage; and that to determine the amount saved at all the various stages of water in different seasons, and different times in the same season, could only be ascertained by constant measurements every year and throughout the year. This finding amounts to a mere negation, but in the view which the court took, that whatever water was saved belonged in equal portions to plaintiffs and defendants, an exact finding as to the amount saved was immaterial. Under the view here expressed, that defendant is entitled to the water saved, it becomes necessary for the court to find specifically upon this matter. The difficulty which the court experienced in arriving at the facts is not an unusual one, but it is one which nevertheless must always be met. As was said in the early case of *Butte* v. *Vaughn*, 11 Cal. 143, [70 Am. Dec. 769]: "There may be some difficulty in cases like the present, in determining with exactness the quantity of which parties are entitled to divert. Similar difficulty exists in the case of a mixture of wheat and corn. The quantity to be taken by each owner must be a matter of evidence. The courts do not, however, refuse the consideration of such subjects because of the complicated and embarrassing character of the questions to which they give rise. If exact justice cannot be obtained, an approximation to it must be sought, care being taken that no injury is done to the innocent party." It will, therefore, be the duty of the trial court, upon a rehearing of this matter, with the evidence before it, to determine with such exactness as may be possible the percentage of salvage water.

What has been said as to the salvage water is equally applicable to the water developed and carried by the pipe-line along the bed of the creek. This pipe-line, the court finds, collects and preserves an amount of water varying from twenty-five to fifty inches. The court finds as to this water that, under the changed mode of diversion by the Ontario pipe-line, none of it reaches the dam, but if the old system of natural flow prevailed, then this water would flow to the division dam, or would go to support and sustain the surface stream to the extent that the waters filled the soil and gravel beneath the surface stream. All this may be quite true, and yet afford no argument to support plaintiffs' claim to this water, nor yet any reason why there should be a return to

the old system of diversion. It might be that it required a thousand inches of water to fill the voids and to support a surface flow of fifty inches. Yet, as in the Muscupiabe case, if the owner of the fifty inches received that amount of water, he could not assert any title to the thousand inches of water which, by a change in the mode of delivery, not to his injury was preserved from waste. So here, if plaintiffs get the one half of the natural flow to which they are entitled delivered, unimpaired in quantity and quality, through a pipeline, they are not injured by the fact that other water, which otherwise would go to waste, as merely supporting the surface flow, was rescued. Nor can they lay claim to any of the water so saved.

2. The Dexter Claim.—The origin and history of this claim has already been set forth, together with the disposition which the court made of it. Plaintiffs, as appellants upon this matter, insist that under the agreement of 1877 between Loop and Meserve and the Cucamonga Water Company, it was the duty of the Cucamonga Water Company to protect the predecessors of plaintiffs, and consequently plaintiffs themselves, against this Dexter claim, which was against the waters of the east side; that the same duty devolved upon the defendant, and that in the acquisition of this Dexter claim it was but performing the duty cast upon it by the contract of 1877, consequently that the Dexter water should come out of the moiety due to the east-side users without impairment of the full one half to which plaintiffs are entitled.

But Dexter had obtained a judgment against plaintiff, the Pomona Land and Water Company, representing the parties to whom the west-side water was distributed, and the Chaffeys, who then held the title to the east-side water, which judgment was a consent judgment, and was acquiesced in by all concerned. Moreover, in the contract between the Pomona Land and Water Company, as has been repeatedly pointed out, the Dexter twenty inches is recognized as an existing outstanding water-right, and the division of the waters contemplated is repeatedly declared to be all the water at the division dam, excepting the Dexter claim to twenty inches. There can be no doubt, therefore, not only of the right of the defendant to acquire this outstanding and hostile water-right, but, after acquiring it, to use the water as its own, within the limitations

of the judgment which established the right.    Herein it is
contended by defendant that the judgment awarded to Dexter
an absolute right to twenty inches, to be used wheresoever
and in whatsoever way he deemed fit, and reference for a
parallel judgment is made to the case of *Southern California
Inv. Co.* v. *Wilshire,* 144 Cal. 68, [77 Pac. 767].   The judg-
ment in the case at bar, after reciting that a stipulation had
been filed and signed by the parties that judgment by consent
"be entered in favor of defendant for twenty inches of water
under a four-inch pressure," etc., states: "It is therefore
ordered, adjudged and decreed that plaintiffs are entitled to
the use, enjoyment and control of all the water of San Antonio
Creek described in their complaint, save and except the
amount of twenty inches, . . . and the defendant be and
is hereby perpetually enjoined from diverting from said San
Antonio Creek any greater or larger amount than the twenty
inches hereinabove described." It is well settled that resort
may be had to the pleadings and issues joined thereunder
to explain and to limit the language of a judgment.   (23 Cyc.
1101; Van Fleet, Former Ad., secs. 376 et seq.)    In the
Dexter case it appears, by an inspection of the pleadings,
that the action was for an injunction to restrain Dexter from
diverting any of the waters of the stream.   Dexter made
answer that he was not interfering with the waters of the
stream nor with any of plaintiffs' rights therein, saving as
in his answer afterwards set forth, and in that answer he
alleged ownership of riparian land and that he was using,
and that there was necessary for use upon his land for irriga-
tion and for domestic purposes, a perpetual flow of eighty
inches of water.   Under this condition of the pleadings it was
that the Dexter judgment was entered, and thus it clearly
appears that Dexter's sole claim was to twenty inches of
water as riparian owner for domestic use and for purposes
of irrigation upon the land which he owned.  The estoppel
of this judgment can go no further.   Therefore the entire
change in use made by defendants whereby none of the water
is used upon the Dexter land, but all of it is transported to
land without the watershed, is clearly a use not countenanced
by the judgment and one which, as the court finds, is injurious
to plaintiffs.   Because under the original use upon the riparian
lands a large percentage of the water found its way back to

the stream and so to the division dam, thus increasing the amount to which plaintiffs were entitled. The use made by the defendants wholly eliminated this water. It follows therefore that the use of the water now made by defendants does not derive support from the Dexter judgment, nor yet from the subsequent use of Gird, Dexter's grantee, who used the water as Dexter had used it. But the defendants for a long time had openly and notoriously, and under this claim of right, diverted the water by flume at a point immediately above the division dam, and had not allowed the water to flow over that dam for division and distribution. To the extent of eighteen inches the court finds that the defendants thus had acquired a prescriptive title, and the findings to this effect are fully supported by the evidence. It follows therefore that as to the Dexter claim the defendants are entitled to eighteen inches of water and no more.

For these reasons it is ordered that the appeals of plaintiffs be denied; that such part of the judgment as is appealed from by defendants touching their claim to the salvage water and to the water impounded by the pipe-line in the bed of the creek be reversed, with directions to the trial court to determine the percentage or amount of water so saved or developed, which said amount, with the eighteen inches to which defendant (San Antonio Water Company) has acquired prescriptive title growing out of the Dexter claim, may first be taken by defendant, after which the remaining waters are to be divided as in the judgment provided. The defendants' appeal from that portion of the judgment affecting the Dexter claim is also denied. Defendants will recover their costs upon appeal.

Shaw, J., Angelotti, J., Sloss, J., Lorigan, J., and McFarland, J., concurred.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.