WILLIAM KENT, JR., Respondent, *v.* ALFRED MERRITT SMITH, as State Engineer of the State of Nevada, Appellant, and PERSHING COUNTY WATER CONSERVATION DISTRICT OF NEVADA, a Corporation, Intervenor and Appellant.

No. 3382

July 12, 1943.                    140 P. (2d) 357.

*Alan H. Bible,* Attorney-General, and *W. T. Mathews* and *George P. Annand,* Deputy Attorneys-General, for Appellant.

*Roy W. Stoddard, John S. Halley,* and *Wm. Cashill,* all of Reno, for intervening Defendant and Appellant.

*Morley Griswold* and *George L. Vargas,* both of Reno, for Respondent.

## OPINION

By the Court, ORR, C. J.:

Respondent, feeling himself aggrieved by a decision of the state engineer of the State of Nevada affecting his interests and relating to what the respondent alleged to be the administration of determined rights found in the so-called Bartlett Decree, which said decree is a final determination of the relative rights of the water users

of the Humboldt River stream system, instituted an action against the said state engineer, in the district court of Humboldt County, under section 75 of the water law of the State of Nevada, being section 7961 N. C. L. Later the Pershing County Water Conservation District of Nevada, a corporation, was permitted to intervene. The cause went to trial and resulted in a judgment being entered which directed the state engineer to divert or permit to be diverted from the Humboldt River stream system for the use of respondent a sufficient amount of water, at the time and in the amounts and according to priorities to comply with the terms of the so-called Bartlett Decree, with measurements at his diversion works at or near his land. The state engineer and intervening defendant have appealed.

Appellants and respondent are agreed that only such relief as is awarded by the said so-called Bartlett Decree to the predecessors in interest of respondent can be enforced in this action. . Appellants assert that in determining the rights granted the predecessors of respondent the trial court was limited to an inspection of the decree, and, also, in construing the same, recourse to the judgment roll might be had. Appellants further contend that, such being the case, the trial court erred in permitting to be introduced and considered evidence relating to conditions which existed long prior to the entry of the said Bartlett Decree. Respondent answers by stating that evidence of the conditions as they existed long prior to the entry of the Bartlett Decree was not introduced for the purpose of altering the decree in any manner, but merely to show changed conditions.

A court may construe a prior judgment, but in so doing is limited to the decree and the judgment roll, and cannot properly consider extrinsic evidence. Pomona Land & Water Co. v. San Antonio Water Co., 152 Cal. 618, 93 P. 881; Salt Lake City v. Telluride Power Co., 82 Utah 607, 17 P. 2d 281 (rehearing denied, 82 Utah 622, 26 P. 2d 822) ; Arthur Irrigation Co. v. Strayer, 50 Colo. 371, 115 P. 724; Sharp v. McColm, 79 Kan. 772,

101 P. 659; Sharkey v. City of Butte, 52 Mont. 16, 155 P. 266; Carpenter v. District Court, 59 Nev. 42, 73 P. 2d 1310, 84 P. 2d 489; Reed v. National Grocery Co., 136 Wash. 7, 238 P. 990; Adams et al. v. Perry et al., 168 Or. 132, 111 P. 2d 838, 119 P. 2d 581.

■ The showing of changed conditions, if that was the purpose of the introduction of the evidence complained of, should have been limited to conditions existing at the time of the entry of the Bartlett Decree and subsequent thereto, and it was error to admit evidence of prior conditions.

Proceeding to examine said decree, we find the following, on pages 93 and 94 thereof, relative to the Kent lands:

"Claimant—A. E. Kent Co.

"Service—Humboldt River

"Ditch—Outside Slough."

Then follows the description of the lands, which are given a priority right of 1886, and the water right given said lands calls for 6.5 cubic feet per second March 15–April 28; 3.82 cubic feet per second April 28–June 13; .60 cubic feet per second June 13–September 15.

■ The above statement appearing on the face of the decree does not fix a point of diversion from the Humboldt River, so we now turn to the judgment roll for assistance in construing said decree and to try to ascertain whether or not information as to the granting of a point of diversion to the predecessors in interest of respondent can be had. The applications made to the state engineer for permission to appropriate the waters of the Humboldt River, by the predecessors in interest of respondent, form part of the judgment roll and are competent to be examined for the purpose mentioned.

The first application was made on the 20th day of March, 1921, by a Mr. Bain. Item 21 of said application states: "It is difficult to state the location of the original dam, ditches and levies, the same having been changed and no trace of the original site left. The map sent to your office shows the location of the present

works." Here, again, we fail to find any statement of the point of diversion from the Humboldt River.

The foregoing proof of appropriation was amended September 3, 1921. Item 29 thereof reads: "(2) The means of diversion employed—check dams and slough." Under item 14 we find: "all the land has been irrigated from date of ownership on account of owners above turning more than enough water down the slough; also get all waste water." No mention of a point of diversion from the Humboldt River in those items.

The second amendment was filed December 27, 1921, item 22 of which reads:

"Remarks: The above lands that are irrigated by the waters of the Humboldt River get their water mostly from what is called the 'Outside Slough' canal, and from this canal or old river channel as it seems to have been, dams have been built as far back as 1874 or 1873, and by these dams the lands have been irrigated, either by backing the water up and overflowing the lands or by canals and ditches leading off from the Outside Slough canal. There is a large slough in the North part of sec. 28 and SW parts of sec. 21 that is used to irrigate the parts of lands adjacent to this territory, though the lands it irrigates is mostly sage, greasewood and grass, nevertheless the matter of irrigation has been carried out, such lands being irrigated by flooding mostly." And here, as before, no statement as to point of diversion from the Humboldt River.

In the original application the statement as to the owners above turning more than enough water down the slough referred to the Ellison Ranching Company and John G. Taylor, who owned large tracts of land immediately above and adjacent to the land owned by respondent.

So, without specific mention in the decree or the applications made by the predecessors in interest of respondent as to a point of diversion from the Humboldt River, what was the character of the right, if any, which the predecessors in interest of respondent were

given by said decree?  Intervening defendant characterizes the right as secondary, being based upon the use of waste water, which cannot or could not ripen into a vested right.  Gallio v. Ryan, 52 Nev. 330, 286 P. 963. However, it seems to us that the right claimed by the predecessors in interest of respondent and which the said Bartlett Decree gave was more than that.  The right was predicated upon the amount of water permitted by users above to flow down the Outside Slough, in addition to the waste water.  The right accorded by the said Bartlett Decree makes no mention of a secondary right or a waste water right; there is no qualification whatever of the right granted.  We feel the reasonable construction to be placed on the Bartlett Decree is that the court found that the water users above the Kent land had permitted the water to flow down the Outside Slough for a sufficient length of time and under such terms and conditions as to invest the owner of the Kent land with a right thereto.  Water being permitted to run down the slough from above under such conditions as to vest the use thereof in the predecessors in interest of respondent, it would naturally follow that that right would extend to the diversionary works employed and used by the owners of the lands above, for the court will be presumed to have considered the entire situation in granting the right and to have decreed the use of the then existing instrumentalities which made that right effective.

If the set-up as it existed at the time of the entry of the so-called Bartlett Decree had continued, a satisfactory distribution of the water as decreed to the predecessors in interest of respondent could have been made by the state engineer without difficulty and without infringement on the rights of any other water user. But a material change did occur.  Along in 1934 and again in 1936 the Ellison Ranching Company and John G. Taylor sold some 28,000 acre feet of water to the Pershing County Water Conservation District of Nevada, a corporation, and said last-named corporation made

application to the state engineer to change the place of use and point of diversion to a point many miles down the stream system, which said application was granted. This water was taken from the lands of the said Ellison Ranching Company and John G. Taylor; this necessitated the removal of the Wilcox dam which had been in the Humboldt River bed, the placing of a dam across the mouth of the Wilcox Ditch and one across the mouth of the slough just below the Wilcox ditch, and the removal of the Ames and Henderson dams, which were farther down the stream but had been used to divert water upon lands above those owned by respondent. The diversion of this water by the construction and removal of the dams above mentioned left the lands of the respondent high and dry, so to speak. Pursuant to the application for a change of place of use and point of diversion of the water sold by the Ellison Ranching Company and John G. Taylor, the state engineer gave notice of the said application as required by law. Respondent made no objection to the order of the state engineer changing the point of diversion and the place of use.

Finding himself without water subsequent to the diversion down stream of the water formerly used by the Ellison Ranching Company and John G. Taylor, respondent made demand upon the state engineer to comply with the Bartlett Decree and furnish him water as provided therein. In 1937, in order to make a test as to what could be done relative to respondent's demand that he be furnished water in compliance with the Bartlett Decree, the state engineer caused portions of the dams across the Wilcox ditch and the slough immediately below said ditch to be taken out and water allowed to flow into the Outside Slough; there was also removed a dam in the slough at a point near what is known as the Nelson House. Fifty-seven cubic feet of water per second was turned into the Outside Slough for a considerable length of time, and it required this in order to cause any appreciable amount of water to appear at respondent's diversion works in the slough.

Other measurements taken were forty cubic feet per second diverted from the Humboldt River at the Wilcox Dam; after that much was allowed to run for some time, about four cubic feet per second appeared in respondent's ditch. In 1941, due to flood conditions of the Humboldt River, water flowed into the Outside Slough in the vicinity of the Wilcox dam; tests were made of this flow of flood water, which was found to approximate a maximum of thirty cubic feet per second, and the water never reached the stage where it would flow into the Kent ditch. The experiments were discontinued, and respondent later renewed his demand upon the state engineer that he distribute water to him. The state engineer refused, basing his refusal on two grounds: first, that the Bartlett Decree fixed no point of diversion, and, second, that to divert water from the Humboldt River into the Outside Slough in the vicinity of the Wilcox dam in sufficient quantity to serve the demand of respondent would result in an unlawful and willful waste of water.

■■ Respondent says that his requests were reasonable, and all that was or is necessary for the state engineer to do is to remove dams unlawfully placed in the slough at places which he claims are a confluence of the Outside Slough and the Humboldt River, and, this being done, the water would then be permitted to flow into and through a natural channel. We do not agree with respondent that there is a natural channel leading from the point where the Wilcox dam was constructed to the Outside Slough. That connection is by means of a man-made ditch, and its construction would, of course, have been unnecessary if there had been a sufficient confluence to permit sufficient water to flow into the Outside Slough to meet existing demands. The question confronting the state engineer was not as simple as the mere removal of the dams in question. To do that and thus permit waters of the Humboldt River to run without restraint into the seemingly insatiable maw of the water-absorbing Outside Slough and its adjacent arid

and now unproductive land would inevitably result in the violation of the vested rights of some water user or users farther down the stream system. This would be so because there is only a given amount of water in the river and this has all been appropriated. Every cubic foot of water taken out of the river over and above that allotted to the respondent would diminish the stream flow decreed to others, in just that amount, and some user or group of users would be denied that much, because it must be remembered that the Outside Slough from the beginning to the end of its tortuous course traverses thirty miles, and it is only under exceptional conditions that any of the water which flows into it again reaches the stream system. It is fifteen miles from the Wilcox dam to a point where the slough runs under the railroad tracks at a point a short distance above the point where the diversion works used by respondent are placed. The slough is five or six feet wide at the bottom and from twenty-four to twenty-five feet wide at the top, and water placed therein wends its sluggish way through thick clumps of willows, both living and dead. As long as water used on the Ellison Ranching Company property and the John G. Taylor property ran through the Outside Slough, that water assumed the major part of the burden of evaporation and seepage; when that water was taken away, the evaporation and seepage burden became too great for the water which was decreed to the respondent's land to bear. In the event the state engineer should supply out of the Humboldt River the water necessary to bear the burden of seepage and evaporation, in order to get the claimed water to respondent's land, manifestly there would result a great waste of water and infringement upon the vested rights of others. This the state engineer has no authority to do, and if he attempted to do so it is quite probable that he would be immediately met with injunctive proceedings. This court cannot order him to do it, because by so doing we would be passing upon the rights of parties who are not now before us,

and acting in contravention of the announced policy of the state that "reasonable and economical use of water applies as well to methods of diversion as it does to the application of the water to the land itself." Doherty v. Pratt, 34 Nev. 343, 124 P. 574, 576.

█ At this point respondent may reasonably ask: Am I to be deprived of a vested right awarded me by a solemn decree of a competent court because the state engineer has seen fit to permit water, which has maintained the water table in the vicinity of my land at a high level and water which bore the greater portion of the burden of transmission loss by seepage and evaporation, to be taken from the land above and the ditch which I had theretofore used and to be sent down the river? The answer to that is that laws have been enacted in this state for the protection of water users under such circumstances; section 7948 N. C. L. contains the positive admonition that the state engineer shall not permit a change of place of use or diversion if such proposed change tends to impair the value of existing rights or to be otherwise detrimental to the public welfare. A serious question remains as to whether respondent took necessary action to protect the rights given by said section.

It seems clear that it was the change of place of use of water which leaves respondent in the position he now finds himself. Now this question is posed: is the order of the state engineer permitting such change a legal and valid order? If it is, then it follows that respondent would be under the necessity of seeking permission of the state engineer to construct such diversion works as would allow the state engineer to apportion the water to him as decreed in the Bartlett Decree without the intolerable waste incident to diverting water at the Wilcox dam. If the order is invalid and made in violation of the terms of section 7948, supra, that would mean a cancellation of the permit to change the point of diversion and place of use of the water formerly used upon the Ellison Ranching Company and John G. Taylor

ranches, or perhaps the alternative of requiring the purchasers to substitute diversion works so that water could be distributed to respondent in accordance with the usages and practices in the district. Instructions to the state engineer to furnish water to respondent cannot be given until after the validity of the order permitting a new point of diversion and place of use has been determined.

We conclude that we are without jurisdiction to determine that question here. This action centers solely upon a construction of the Bartlett Decree. The order changing the point of diversion and place of use was made long subsequent to the entry of the decree, and bears no relation to it. It is very probable that parties not now before the court have interests which would be vitally affected by a judgment affirming or disaffirming the order; such parties can only be given a chance to be heard in a new action, whose pleadings and proceedings present that issue.

The judgment entered herein is reversed, and the trial court is directed to dismiss the action.